In re AUTO PARTS CLUB, INC., Debtor.

**LOBEL & OPERA, a professional corporation, Appellant,**

v.

**UNITED STATES TRUSTEE, Goodyear Tire & Rubber Co., Appellees.**

BAP No. SC–96–1999–JORy.
Bankruptcy No. 95–06405–A11.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted May 21, 1997.

Decided June 30, 1997.

William M. Lobel, Irvine, CA, for Lobel & Opera, P.C.

Richard S. Berger, Los Angeles, CA, for Goodyear Tire & Rubber Co.

Before JONES, OLLASON, and RYAN, Bankruptcy Judges.

## OPINION

JONES, Bankruptcy Judge.

Appellant, Lobel & Opera ("Lobel") is a law firm which represented the Official Committee of Unsecured Creditors (the "Committee") in the underlying bankruptcy case. Lobel filed its first and final fee application seeking $137,033.50 in fees and $11,134.94 in costs. Lobel had already received $93,514.55 pursuant to an interim fee order. The bankruptcy court found that the requested fees were not necessary because the majority of the fees were incurred after the debtor decided to sell its business, which would result in no distribution for unsecured creditors.

The court held that Lobel should have drastically scaled back its services in light of the remoteness of any recovery for unsecured creditors. The court awarded fees and costs of $50,000 which sum represented the amount that the estate's primary creditor agreed to subordinate its lien in favor of Lobel. Because Lobel had already received $93,514.55 in fees, the court ordered Lobel to disgorge $43,514.55. Lobel appeals. After failing to obtain a stay, Lobel disgorged the fees. The court ordered distribution of the remaining sale proceeds. **WE VACATE AND REMAND** for further findings.

## I. FACTS

The debtor, Auto Parts Club, Inc., owned and operated warehouse superstores which sold automobile parts and accessories in bulk quantities. On June 19, 1995, the debtor filed for chapter 11 relief.[1] On June 21, 1995, the debtor filed a motion for use of cash collateral which projected that a decrease in operating expenses would enable it to operate profitably. On August 7, 1995, at the request of the Committee, the debtor employed Buccino & Associates ("Buccino") as "crisis managers and turnaround consultants." Buccino issued a report which concluded that the debtor could stabilize its business through downsizing, vendor support and a credit arrangement. The report stated "[u]nder an orderly disposition of assets there is, at July 31, 1995, adequate collateral value to pay secured claims plus a dividend to the unsecured."

The debtor had been receiving financing from Shawmut Capital Corporation ("Shawmut"). Shawmut was the estate's largest creditor as it had a first priority lien of approximately $5.5 million on the debtor's inventory, accounts receivable and other assets. Shawmut notified the debtor that it would only continue providing financing if the debtor sought a sale of substantially all of its assets. The debtor, the Committee and Shawmut agreed that the debtor should seek to sell substantially all of the assets of the business. The debtor found an interested buyer. The debtor entered into a court approved stipulation with the Committee and Shawmut under which Shawmut would loan money to the debtor in order to assist the debtor in concluding a hearing on a sale of the business. The stipulation provided that Shawmut would have a first priority lien, but that Shawmut would subordinate its lien up to $50,000 for the payment of Committee expenses and fees and costs of the Committee's counsel in that order of priority. The stipulation was approved by the court by interim order.

On October 17, 1995, the debtor filed a motion for an order approving sale of the business to Hilco/Great American Group ("Great American"). The Committee claims that Great American was only to be considered a "stalking horse" buyer to induce other buyers to bid as Great American's bid was not sufficient to pay any distribution to unsecured creditors. The debtor retained investment banker Houlihan, Lokey, Howard & Zukin ("Houlihan & Lokey") to solicit overbids. At the hearing on the motion, W. John Devine ("Devine") submitted an overbid which was approved by the court. After the court authorized sale to Devine, the debtor ceased operations. The sale to Devine only produced $4 million in net sale proceeds, of which $2 million were disbursed to Shawmut.

Lobel filed its first and final fee application on January 4, 1996, requesting $137,033.50 in fees and $11,134.94 in costs. Lobel had already received $93,514.55 pursuant to an interim fee order. No party objected to the fee application. At a hearing on the fee application held February 1, 1996, the court expressed concern over the amount of fees incurred by the Committee in a case which "probably was D.O.A." and where unsecured creditors received no distribution. Lobel responded that they were very active in the case on the hope that the debtor could reorganize or at least sell its assets for an amount which would produce a very substantial distribution to unsecured creditors. The court questioned whether Lobel duplicated the work of Houlihan & Lokey. The court

---

1. Unless otherwise indicated, all references to Chapters, Sections and Rules are to the Bankruptcy Code, 11 U.S.C. § 101, *et seq*, and to the Federal Rules of Bankruptcy Procedure, Rules 1001, *et seq*.

stated that there was a $3.75 million bid and the Committee needed a $8–9 million bid in order for unsecured creditors to receive a distribution. The court questioned why the Committee incurred substantial fees after the decision to sell the business and after Houlihan & Lokey was employed to solicit bids. The court took the application under submission and warned Lobel that there would be a substantial reduction which might impose upon the fees already paid pursuant to the interim fee order. Lobel informed the court that Shawmut had agreed to subordinate and that if the court allowed the requested fees but denied any additional funds from the estate, Shawmut rather than the estate would pay the additional allowed fees.

On August 9, 1996, the court entered its memorandum decision in which it noted that despite realizing on August 30, 1995, that a sale was in the best interest of the estate, Lobel then rendered an additional $19,583 in services related to asset disposition (Category 51 of the fee application), and $23,294 in financing (Category 58). The court stated that it was troubled that 58% of the fees (or $79,060) was incurred after the decision was made to sell the debtor's business. The court noted that·Houlihan & Lokey and Buccino were paid substantial amounts by the estate to market the debtor's assets and obtain overbids. The court noted that even if the debtor's business had sold for $8–9 million, given the extensive administrative claims against the estate, unsecured creditors still would not have received a distribution. The court stated, "[t]here is no showing that L & O exercised any restraint in incurring fees once the decision to sell the assets was made. Indeed the contrary appears to be true." The court held that the fees were not reasonable because they were not necessary and that the fee application was "grossly disproportionate to the benefit conferred on the estate." The court found that requested costs reflected "overkill" and were not actually necessary. The court then reduced the fees and costs to that amount which Shawmut agreed to subordinate its lien in favor of Lobel—$50,000. The court ordered the balance of the money already

paid to Lobel ($43,514.55) returned to the estate. The court entered a separate order allowing the requested amount of costs ($11,134.94), but only allowing $38,865.06 for fees.

Lobel filed a motion for reconsideration which was denied. Lobel appealed. After Lobel filed its notice of appeal several salient events occurred. Lobel filed emergency motions for stay both in bankruptcy court and at the BAP. Both motions were denied.

On November 21, 1996, Shawmut filed a motion for approval of a stipulation for distribution of the remaining sale proceeds and a motion to dismiss the case. On December 12, 1996, Lobel filed a motion to segregate the disgorged funds into an escrow account. This motion was denied. On December 20, 1996, the court entered an order approving distribution of the remaining sale proceeds. On December 31, 1996, Lobel disgorged the funds to the U.S. Trustee payable to the debtor. On January 6, 1997, the court entered an order converting the case to chapter 7.

## II. ISSUE

Did the bankruptcy court err in reducing Lobel & Opera's fees?

## III. STANDARD OF REVIEW

A bankruptcy court's award of attorney's fees will not be disturbed absent an abuse of discretion or an erroneous application of the law. *In re Nucorp Energy Inc.,* 764 F.2d 655, 657 (9th Cir.1985); *In re Xebec,* 147 B.R. 518, 522 (9th Cir. BAP 1992). We will not reverse an award of fees unless we have a definite and firm conviction that the bankruptcy court committed clear error in the conclusion it reached after weighing all of the relevant factors. *Id.*

## IV. DISCUSSION

*A. Mootness*

■■■ Appellee Goodyear Tire & Rubber Co. (Goodyear) seems to argue that the appeal is moot [2] because the funds Lobel dis-

2. Despite arguing that the disgorged fees may have already been distributed, Goodyear's brief does not mention mootness nor did Goodyear file a motion to dismiss based on mootness.

gorged have already been distributed and even were this panel to reverse the bankruptcy court's order, Goodyear and other creditors have superpriority administrative claims which must be paid before Lobel's administrative claim is paid.[3] In response, Lobel argues that Goodyear lacks standing to raise a mootness issue because Goodyear is not adversely affected pecuniarily by the lower court's order if it does have a superpriority claim. Under general principles of mootness, an appeal will be determined moot where the appellant fails to obtain a stay pending appeal and events occur which prevent the appellate court from fashioning effective relief. *In re Beatty*, 162 B.R. 853, 856 (9th Cir. BAP 1994). The disbursement of funds pending appeal may moot the appeal. *Id.; In re Decker*, 199 B.R. 684, 687 (9th Cir. BAP 1996) (holding that distribution of funds does not moot an appeal where party who received funds is a party to the appeal). In this case, it would be inequitable to hold that the appeal is moot because the disgorged fees have been distributed to creditors. Lobel was required to disgorge fees it had already received. A reversal from this panel would require the same disgorgement from creditors who received the fees. Turnabout is fair play. Accordingly, it is possible for this panel to fashion effective relief and this appeal is not moot. The only issue on appeal is whether the court erred in reducing Lobel's fees. As Goodyear takes no position as to the value of Lobel's services,[4] there is no

need to address the issue of Goodyear's standing.

### B. The Requested Fees Were Not Reasonable Or Necessary.

The Bankruptcy Code authorizes the bankruptcy court to award to a professional "reasonable compensation for actual, necessary services." 11 U.S.C. § 330(a)(1) (1994). In determining the award of compensation, the court considers the nature, the extent, and the value of the professional's services, taking into account factors such as "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case . . . [and] whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed. . . ." 11 U.S.C. § 330(a)(3) (1994). The bankruptcy court cannot allow compensation for services that were not reasonably likely to benefit the estate or were not necessary to the administration of the estate. 11 U.S.C. § 330(a)(4)(A)(ii) (1994). The bankruptcy court has a duty to review fee applications notwithstanding the absence of objections by the trustee, debtor or creditors. *In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833, 841 (3d Cir.1994).

Professionals have an obligation to exercise billing judgment. *Unsecured Credi-*

---

**3.** We will not address the issue of the payment of superpriority claims held by PMSI creditors as it is not properly before us on appeal. After the fee award, Shawmut entered into a Stipulation with several other secured creditors including The Motor & Equipment Manufacturers Association ("MEMA"), Goodyear and several PMSI creditors who were given replacement liens pursuant to the cash collateral order, which claims were given superpriority status pursuant to § 507(b). Neither Goodyear nor the PMSI creditors subordinated their lien rights to the Committee as Shawmut had done. Goodyear claims a superpriority administrative claim of $130,000 and the PMSI creditors claim a superpriority claim of more than $700,000. Goodyear argues that because there were insufficient sale proceeds to pay all of these claims, the creditors entered into a stipulation regarding the distribution of the proceeds, including the fees that Lobel was to disgorge. The stipulation provided that the fees disgorged by Lobel would be distributed on a pro

rata basis within 30 days of receipt. The court approved the stipulation. However, the stipulation is not on appeal before this panel. Thus, we decline to address Goodyear's argument that Lobel must disgorge the fees pursuant to the stipulation for the purpose of paying superpriority liens.

**4.** Goodyear states in footnote 4 of its brief, "Goodyear takes no position as to the value of the services rendered by Lobel & Opera." Also contained in this footnote is Goodyear's only contention on the merits of the fee order, which is a blanket unsupported statement that from the inception of the case, Goodyear took the position that it was unlikely that there would be sufficient assets to pay all secured and administrative claims and "therefore, there was little need for the Committee to incur substantial fees and costs when little or no benefit would accrue to unsecured creditors."

*tors' Committee v. Puget Sound Plywood, Inc.*, 924 F.2d 955, 959 (9th Cir.1991). In *Puget Sound*, the Ninth Circuit affirmed a fee award of one third of the requested fees where the attorney for an Unsecured Creditors' Committee incurred the majority of its fees objecting to a secured creditor's attorneys' fees. *Id.* at 961. Counsel for the Committee argued that his fees of $21,465 were not unreasonable because the possible recovery exceeded $120,000. The Ninth Circuit stated that the secured creditor's agreement provided for attorney's fees and that a reasonable attorney would have been aware that the fees were mandatory and that there was no possibility of recovering the full $120,000. *Id.* at 959. The Ninth Circuit held that counsel for the Committee had "an obligation to consider the potential for recovery and balance the effort required against the result that might be achieved." *Id.* at 961.

The BAP followed *Puget Sound* in *In re Kitchen Factors, Inc.*, 143 B.R. 560 (9th Cir. BAP 1992). In *Kitchen Factors*, special counsel for the debtor incurred $12,562 in fees in an attempt to recover a $12,000 debt. The bankruptcy court awarded fees of 50% of the amount recovered for the estate. The BAP affirmed the award of fees reasoning that because there was a substantial risk that litigation costs would consume any benefit to the estate, the bankruptcy court did not abuse its discretion in reducing the fees. *Id.* at 562. The BAP held that an attorney must scale back its services based on the reasonable expected recovery for the estate, not the potential optimum recovery. *Id.*

 In this case, the bankruptcy court reduced Lobel's fees because Lobel failed to scale back its services based on the reasonable expected recovery. Instead, Lobel continued to incur fees based on the potential optimum recovery, which still may not have provided a benefit to the estate or unsecured creditors. Lobel argues that the bankruptcy court reduced the fees because it believed from the inception of the case the debtor could not reorganize and a sale would not result in any distribution to unsecured credi-

tors. Lobel notes the court's language at the hearing that the debtor was "probably D.O.A." Lobel argues that the court should have objectively determined if the fees were reasonable at the time services were rendered. Lobel claims that it believed that the debtor could reorganize based on the debtor's motion for cash collateral, the court's order for use of cash collateral and the Buccino report. Lobel contends that it still believes that the debtor could have successfully reorganized.

Lobel has completely missed the point. While it may be true that the debtor may have had some chance of a successful reorganization, the debtor, Shawmut and the Committee agreed to sell the debtor's assets rather than reorganize. The basis for the bankruptcy court's reduction in fees was not that the debtor had no possibility of reorganization. The court's memorandum decision is quite clear that the court's basis for reducing Lobel's fees was that Lobel did not scale back its services once the decision was made to sell the debtor's assets, especially in light of the fact that it was unlikely that unsecured creditors would receive a distribution even at the highest possible price of $8–9 million.

Lobel admits that it did not scale back its services.[5] Lobel claims that at the time it rendered services after the decision to sell was made, it believed that a sale of the debtor's assets would produce proceeds between $8–9 million based on the Buccino report of July 31, 1995, which valued an orderly liquidation at $10–12 million. This argument makes it clear that Lobel's services were based on the potential optimum recovery without considering what recovery was reasonable. After the decision to sell was made, Lobel claims it "drastically shifted its approach from supporting the Debtor's attempts to reorganize to assisting the Debtor to market its assets as a going concern. Lobel & Opera concentrated its efforts on obtaining the most lucrative offer for the assets of the Debtor and preserving the estate for the benefit of unsecured creditors."

---

**5.** Lobel states in its opening brief, page 18, "There was no reason for Lobel & Opera to conclude that a distribution to unsecured credi-

tors was merely a 'remote' possibility and that consequently, Lobel & Opera should withdraw or drastically scale back its services."

Some of Lobel's fees were incurred in negotiating overbid and auction procedures for conducting the sale and in negotiations with the prospective purchaser. Lobel then states that through no fault of the Committee, the debtor's marketing efforts failed. Lobel claims that it "should not bear the responsibility for the Debtor's inability to implement the steps necessary to produce a different result...."

Lobel wants to claim credit, in terms of its fees, for all of its marketing efforts in trying to obtain the most lucrative price, but then places all blame on the debtor for obtaining a low price which yielded no benefit to unsecured creditors. Lobel took part in the original decision to sell the debtor's assets. Despite the Buccino report's liquidation valuation, Lobel was well aware that the approximately $3.75 million offer received from Great American was substantially lower than the Buccino report's valuation by $6–8 million. Lobel even tried to negotiate a higher price with a "prospective purchaser." Lobel incurred fees trying to solicit higher bids even though Houlihan & Lokey was hired to solicit bids. Lobel was aware that there were no purchasers willing to bid anywhere close to the Buccino report valuation. Lobel told the bankruptcy court that there was a "realistic possibility" of receiving a bid of $8–9 million. Yet, Lobel offered no proof of bids anywhere close to this figure.

Lobel is correct in stating that the standard is an objective one as to whether the fees were reasonable and necessary at the time they were incurred. Given the approximate $3.75 million offer from Great American, the ultimate sale for approximately $4 million and the lack of offers anywhere close to Lobel's optimum possible bid of $8–9 million, it was not reasonable for Lobel to believe that unsecured creditors would receive anything. Lobel should have scaled back its efforts based on the reasonable expected recovery for the estate, not the potential optimum recovery. The estate should not be consumed by professional fees, especially where the unsecured creditors receive no distribution. *In re Taxman Clothing Co.,* 49 F.3d 310, 316 (7th Cir.1995).

Lobel claims that the bankruptcy court is endorsing a policy of compensation based on hindsight which only compensates professionals for their results, and that such a policy will likely have a chilling effect upon effective legal representation. The policy behind § 330 is not one based on hindsight, but rather one based on an objective determination at the time services were rendered. A professional cannot ignore a likely result, but must exercise billing judgment. The Seventh Circuit rejected this hindsight argument in *Taxman,* stating that a professional must scale back its services once it becomes reasonably obvious that further litigation would cost more than it was likely to bring into the estate. *Id.* at 313–15. Despite the outcome of any case, once it becomes reasonably obvious that further litigation would not benefit the estate, the attorney must scale back its services. The court below held that Lobel should have scaled back its efforts after the decision to sell. We agree. Had Lobel scaled back its efforts, it would have most likely been awarded its fees, despite the lack of distribution to unsecured creditors. Lobel's fees should have been reduced in view of the final benefit to the estate's creditors. Now we must determine whether the amount of fees awarded was proper.

## C. *The Court's Abandonment Of The Lodestar Method.*

The Ninth Circuit held in *Puget Sound,* 924 F.2d at 960, that the lodestar approach is the primary, not exclusive method for calculating fees, and that the court could employ an alternative formula where the court could not realistically quantify to numerical precision the lodestar calculation. In *Puget Sound,* the court abandoned the lodestar approach and instead awarded counsel one third of the requested fees. *Id.* In *Kitchen Factors,* 143 B.R. at 562, the BAP held that it would be appropriate to abandon the lodestar method where the detail of time spent is grossly disproportionate to the amounts at stake. "[I]f a fee application is inadequate, the court should not be forced to wade through it in order to calculate a 'lodestar'." *Puget Sound,* 924 F.2d at 961.

Although Lobel attempts to factually distinguish both *Puget Sound* and *Kitchen Factors*, the law is well settled that the court may abandon the lodestar approach when the court cannot reasonably quantify to numerical precision the amount of the fee award. We agree that Lobel performed unnecessary services when it failed to scale back its efforts after a decision to sell was made. However, before the decision to sell was made on August 30, Lobel had already incurred fees of more than $57,000. By awarding Lobel only $38,865.06 in fees plus costs of $11,134.94, the court was also reducing Lobel's fees incurred before the decision to sell was made. The court in its memorandum decision indicated that it was concerned with fees charged for Lobel's review of fee applications, employment of financial consultants for the debtor, case administration, asset disposition and financing. Yet, the court did not make any findings regarding how much of these fees should be reduced based on the court's concerns. The court instead awarded a fee amount based solely on the amount Shawmut agreed to subordinate. Moreover, although we agree that Lobel should have scaled back its services after August 30, that does not mean that Lobel was required to terminate its services. By only awarding $50,000 in fees and costs, the court is necessarily reducing Lobel's fees for all work performed after August 30 as well as some of the work performed before August 30. We agree that the court may abandon the lodestar approach when the court cannot reasonably quantify to numerical precision the amount of the fee awarded. Here however, the court did not make any findings as to why Lobel should receive no compensation for work performed after August 30. Neither did the court make specific reductions for work performed prior to August 30. Without such findings we are unable to properly review the amount of the fee award. Accordingly, **WE VACATE AND REMAND** in order for the court to make specific findings as to the amount of the fee award.

### V. CONCLUSION

Lobel failed to scale back its services once it became reasonably obvious that unsecured creditors would not receive a distribution.

However, the court did not make sufficient findings regarding why Lobel should receive no compensation for work performed after the decision to sell was made, or why Lobel's fees should be reduced for services performed prior to the decision to sell. **WE VACATE AND REMAND** in order for the court to make appropriate findings regarding the amount of the fee award.