In re AUTO PARTS CLUB, INC., Debtor and Debtor–in–Possession.

Bankruptcy No. 95–06405–A11.

United States Bankruptcy Court,
S.D. California.

Aug. 9, 1998.

Mary Testerman, U.S. Trustees Office, San Diego, CA, U.S. Trustee.

Richard S. Berger, Tuttle & Taylor, Los Angeles, CA, for The Goodyear Tire & Rubber Company.

Robert Lewis, c/o Anderson, Ablon, Lewis & Gale, Los Angeles, CA, for Maramont Corporation, Federal Mogul Corporation and Gabriel Ride Control Products, Inc.

## MEMORANDUM DECISION

LOUISE DeCARL ADLER, Chief Judge.

The purpose of bankruptcy law is to equitably adjust the relationship between a debtor and its creditors, ratably distributing limited assets among competing claimants in accordance with the federally-mandated priority scheme. The judges appointed to oversee this process are primarily charged with resolving disputes among those claimants and between the claimants and the debtor. As the caseload grows, so do the number of disputes.

Bankruptcy judges also have as a *collateral* duty the obligation to review and decide requests for compensation from the estate by the various professionals appointed to administer a bankruptcy. Unfortunately, it appears to be the trend that litigation in pursuit of fees from the estate is increasing, threatening to overwhelm the primary adjudicatory functions of the bankruptcy court to the detriment of other litigants and the diminution of estate assets.[1]

On August 6, 1996, this Court issued an unpublished memorandum decision disallowing attorney's fees and costs requested by Lobel & Opera ("L & O"), attorneys for the Official Creditors' Committee ("OCC") in this Chapter 11 case. This Court reduced the $137,033.50 in fees and $11,134.94 in costs requested to an award of $50,000. The reason given for this substantial disallowance was that the fees were not reasonable because they were excessive and the services unnecessary. *See,* Attachment "A" at 7:17–20.

█ Although a firm is normally entitled to a fee equal to the hours worked multiplied by the hourly rate (the lodestar principle), lodestar is not the exclusive method of calculating fees under 11 U.S.C. § 330. Ninth Circuit case law clearly supports that lodestar may be rejected as the means for calculating a reasonable fee when services are unnecessary or when the cost of those services is grossly disproportionate to the result achieved:

> ... Uziel argues that courts must always start with the 'lodestar,' multiplying a reasonable number of hours by a reasonable hourly rate, citing *In re Manoa Finance Co.,* [Citations omitted].... Although *Manoa* suggests that starting with the 'lodestar' is customary, it does not mandate such an approach in all cases. Moreover, *In re Yermakov,* 718 F.2d 1465, 1471 (9th Cir.1983) states that calculating the 'lodestar' is the 'primary' method for calculating fees; 'primary' is not a synonym for 'exclusive.'

*Unsecured Creditors' Comm. v. Puget Sound Plywood,* 924 F.2d 955, 960 (9th Cir.1991).

---

1. Attorneys' fees incurred in prosecution of a contested fee application may also be recouped from the estate (*In re Nucorp Energy, Inc.,* 764 F.2d 655 (9th Cir.1985)) bringing to mind an apt ditty:

> Go to the court o' last resort
> For the sake o' your poor family!
> The Lord sustain! My client's gane,
> He's ruined—but I've got my fee!

George Ontram, Legal and Other Lyrics, 1888, in *The Quotable Lawyer,* 57.14 (David Shranger and Elizabeth Frost, eds., 1986).

This Court's decision was in conformity with applicable Ninth Circuit case law because the findings that the fees incurred were excessive, unnecessary and unreasonable applied to *all* of the fees incurred by L & O, not merely those incurred after the decision to sell the Debtor's assets. Specific examples of "overkill" were given in a number of categories in which substantial fees were incurred *before* the decision to sell. (*See,* for example, Attachment "A" at 4:12–16 and 5:10–22.) In giving these examples, this Court complied with *D'Emanuele v. Montgomery Ward & Co., Inc.,* which states:

> " . . . [c]ourts need not attempt to portray the discretionary analyses that leads to their numerical conclusions as elaborate mathematical equations, but they must provide sufficient insight into their exercises of discretion to enable us to discharge our reviewing function." [Citations omitted]

904 F.2d 1379, 1384–85 (9th Cir.1990). *See also, Gates v. Deukmejian,* 977 F.2d 1300, 1306–07 (9th Cir.1992).

Although the BAP agreed with this Court that the lodestar approach may be abandoned when the Court cannot reasonably quantify with numerical precision the amount of the fee to be awarded, the BAP then vacated and remanded the fee award precisely for that purpose. *In re Auto Parts Club, Inc.,* 211 B.R. 29, 36 (9th Cir. BAP 1997). The unfortunate result of requiring an hour-by-hour analysis of this fee request is to impose upon this Court an unduly burdensome task which is legally unnecessary. As observed by the United States Supreme Court, "A request for attorneys fees should not result in a second major litigation." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

Revisiting the L & O fee application has perhaps had a salutary effect. It provides the Court with the opportunity to discuss the Debtor's earlier objections raised to L & O's employment and reserved for disposition at the final hearing on its application. As well, the exercise in *again* reviewing the actual work product in detail serves only to reinforce the conclusion that the request for compensation was grossly disproportionate to the benefit conferred. The unpublished opinion attached as an exhibit to this decision is incorporated by reference to fill any interstices remaining after this second review.

 As stated in the unpublished opinion, L & O filed its first and final fee application on January 4, 1996. The Court believed the firm was seeking $137,033.50 in fees and $11,134.94 in costs. In actuality, the only amount properly noticed to all creditors was a request for $127,595.00 in fees and $10,746.50 in costs. A supplemental declaration filed by the firm on February 1, 1996, requesting an additional $9,438.50 in fees and $338.44 in costs, was never noticed to all creditors as required by FRBP 2002. As a consequence, the supplemental request must be disallowed in full.

Further, the Debtor had objected to L & O's employment at the inception of this case on the grounds that the hourly rates requested for compensation by the firm were excessive based on community standards. The Debtor filed a detailed Request for Judicial Notice in support of its objection, citing seven bankruptcy cases pending in this district at the same time as *Auto Parts* of similar, if not greater, complexity. In each of those cases in which well-qualified attorneys from major law firms in this community were employed, the hourly rates of the attorneys, legal assistants and summer interns of similar experience were substantially less than those proposed to be charged by L & O.

L & O chose not to face this issue directly at the commencement of the case but reserved it for determination at the time of the final hearing. A stipulation preserving the objection was filed on September 7, 1995 stating:

> The Debtor's objection to the reasonableness of the hourly rates charged by L & O shall be reserved until the time of the hearing on L & O's final fee application in the case. Pending the resolution of the issue of the reasonableness of L & O's hourly rates, any award of interim compensation to L & O under any compensation procedure approved by this Court shall be set at L & O's hourly rates set forth in the Application.

(Stipulation filed September 7, 1995, at 2:24–26, 3:1–2.)

██ Bankruptcy Code § 330(a) permits the Court to award the professionals hired *reasonable* compensation. *Yermakov,* at 718 F.2d 1465. As the bankruptcy court in *In re Gianulias* observed:

> The starting point for an award of attorneys' fees is to multiply the number of hours reasonably spent on the case by a reasonable hourly rate. *Southerland v. International Longshoreman's and Warehouseman's Union, Local 8,* 834 F.2d 790, 795 (9th Cir.1987). The prevailing market rate in the community is indicative of a reasonable hourly rate. The fee applicant has the burden of producing satisfactory evidence, in addition to affidavits of its counsel, that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably, comparable skill and reputation. *Id.*

111 B.R. 867, 870 (E.D.Cal.1989).

██ The Debtor's evidence that the hourly rates L & O charged were excessive based on community standards in the Southern District of California was and is persuasive. Accordingly, the Court reduces the hourly rates charged by L & O to the OCC by its attorneys, legal assistant and summer interns to the following rates which are consistent with the then-prevailing community standard for similarly qualified attorneys:

| | REQUESTED RATE | ADJUSTED RATE |
|---|---|---|
| Robert Opera | $ 340.00/hr. | $ 245.00/hr. |
| Pamela Karger | 225.00/hr. | 185.00/hr. |
| Metiner Kimel | 160.00/hr. | 125.00/hr. |
| Legal Assistants: Lemay, Gauthier, Ortiz and Wescott | 125.00/hr. | 105.00/hr. |
| Summer Intern (Christian [2]) | 140.00/hr. | 80.00/hr. |

Applying these reduced hourly rates to all hours charged by L & O in this case results in an overall reduction of the gross fees charged by L & O from $127,595.00 to $93,564.50. The difference will be disallowed as excessive. These reduced fees will be called "adjusted fees" and will be discussed below in each category.

In reviewing the BAP's opinion, it is apparent that they agree with this Court's determination that L & O performed unnecessary services when it failed to scale back its efforts after the decision to sell was made. The BAP's criticism appears to be that the Court did not make specific the amount of the reductions made even though this Court discussed generally and provided examples of its reasons for finding L & O's fees excessive. The following analysis addresses each and every category in which L & O billed fees rather than only those highlighted in the Court's earlier opinion.

**(1)** *Category 49—Fee/Employment Applications of Other Professionals:*

The observations made in this Court's earlier opinion are adopted in full with some modifications. First, in recomputing the amount of time spent hiring the "free" financial consultant, the court corrects earlier calculations. It appears that the time billed was 8.0 hours of paralegal time and 3.8 hours of partner time. Second, the Court concludes there was an artificial distinction drawn between Category 49 and Category 57 (Fee/Employment Objections). For example, the Debtor's proposed employment of, *e.g.,* English & Gloven as special litigation counsel was billed to Category 49, yet time spent filing a "limited objection" to that employment was billed to Category 57. This balkanization of time entries tends to obscure the true amount of time spent by the firm on any one task. Further, it appears that firm members themselves were confused by the

---

**2.** In its application to be employed as counsel for the OCC, L & O did not identify a rate for law clerks but only for summer interns. The firm made no request for authority to employ law clerks at any rate. Accordingly, Mr. Christian is treated as a summer intern.

distinction. (*See, for example*, Category 49 entry by Kimel on 09/18/95 for reviewing/revising objections and Category 57 entry by Kimel on 09/17/95 and 09/18/95 preparing the objections.)

Accordingly the Court combines and totals these categories, resulting in $18,363.00 in fees charged. Recalculating these fees to reflect rates charged by similarly qualified professionals in this community, the total adjusted fees in these categories are reduced to $13,820.00. The difference is disallowed as excessive.

■ Approximately 38% of the fees billed to Categories 49 and 57—$5,208.36 in adjusted fees ($6,920.50 at pre-adjustment rates)—was incurred after the decision to sell the assets of this estate. While some of this time was attributable to pointing out the obvious—that is, why did the Debtor require all these professionals if its plan was to sell all assets—a considerable part of the time was spent sorting out L & O's various problems getting itself employed as counsel or trying to get the "free" financial consultant employed. The Court reduces these amounts by 90%, a disallowance of $4,687.52 at adjusted rates ($6,228.45 at pre-adjustment rates).

Finally, fees incurred in these categories before the Debtor's sale decision should also be reduced because they are excessive. Once again, much of this time was spent dealing with employment of the "free" financial consultant or sorting out L & O's numerous problems in getting itself employed.[3] It is not reasonable for these expenses to be foisted upon a debtor. The Court finds these fees excessive and reduces the adjusted fees of $8,611.64 ($11,442.50 at pre-adjustment rates), by 50%, disallowing $4,305.82 as excessive. In summary, L & O is allowed fees in Categories 49 and 57 totaling **$4,826.66.** The balance is disallowed.

### (2) Category 50—Asset Analysis and Recovery:

■ Other than reducing the fees in this category to an hourly rate consistent with community standards, the Court makes no other reductions. L & O is allowed adjusted fees of **$457.50;** the balance of $154.50 is disallowed.

### (3) Category 51—Asset Disposition:

■ First, the Court reduces the entire $26,377.00 request to an amount consistent with community standards. Because of this, the Court disallows $7,613.00 in fees as excessive.

Second, this category contains some of the most egregious examples of "overkill" in this case. For example, between 08/04/95 – 09/01/95, 0.9 hours of partner time, 1.8 hours of associate time and 1.1 hours of paralegal time was spent in producing a scant two page objection filed September 1, 1995 (Document No. 194) requesting this Court limit the Debtor's extension of time to assume or reject executory contracts to 60 days. The opposition was not accompanied by points and authorities citing any legal authority nor declarations in support.

When the Debtor filed yet another motion to extend, between 10/30/95 and 11/08/95, L & O expended 1.0 hours of partner time, 0.3 hours of associate time, 8.4 hours of summer intern time and 1.0 hours of paralegal time to produce yet another three page opposition (Document No. 409, filed November 28, 1995), again without points and authorities or declarations. In fact, a review of the relevant time entries seems to suggest that the paralegal actually produced the opposition.

Finally, in opposing the Debtor's motion to assume a contract for advertising with the Union Tribune Publishing Company, the firm expended 0.8 hours of partner time, 0.2 hours of associate time and 9.8 hours of summer intern time between 11/07/95 – 11/27/95. Interestingly, 3.2 hours of summer intern time was spent *after* the motion had been withdrawn by the Debtor. No written opposition was ever filed by the Committee.

For the above reasons and those stated initially in the Court's first opinion, the Court reduces the already adjusted fees in Catego-

---

**3.** L & O did not actually secure an order appointing the firm as counsel to the OCC until 09/20/95, three months after the case was filed.

ry 51 by 75%, disallowing $14,073.00 as excessive.

In summary, L & O is awarded adjusted fees of **$4,691.00** in Category 51 with the balance disallowed.

#### (4) Category 52—Business Operations:

 L & O's fee application fairly describes the nature of the services rendered in Category 52. Reducing the $11,909.00 in fees incurred to an amount consistent with community standards results in adjusted fees of $8,683.00 requested; the difference is disallowed as excessive.

Most of the post-sale decision time in this category (*see*, entries at 09/14/95 – 10/19/95) was spent on the OCC's opposition to the Debtor's management retention plan. The firm prepared and filed a six-page opposition (Document No. 311 filed October 13, 1995) pointing out, as stated in the firm's application, that the plan was excessive under the circumstances of the case and bore no relation to the value to be added by the retention of those personnel. While the Court found the objection somewhat helpful to its analysis, the amount of time L & O spent in producing this objection is excessive: 7.7 hours of partner time, 7.1 hours of associate time and 0.7 hours of paralegal time which when billed at the adjusted hourly rates totals $2,895.50 (approximately one-third of the charges in this category).

L & O justifies the time spent claiming that the objection demonstrated that the Debtor's retention plan ".... would substantially decrease the likelihood that unsecured creditors would receive any distribution in the case...." (Fee Application at 21:9–10.) As observed by this Court (with the apparent concurrence of the BAP) the likelihood of any distribution to unsecured creditors was extremely remote at this stage. This is yet another instance of L & O continuing to incur fees based on a potential optimum recovery without regard to what was reasonably necessary at the time. Accordingly, this Court reduces the award for time spent in this activity by 75%, resulting in the sum of $2,171.63 disallowed and the sum of $723.87 allowed for this service.

In summary, L & O will be awarded **$6,511.37** in this category with the balance disallowed as excessive.

#### (5) Category 53—Case Administration:

 The observations of the Court about the nature of the activities in this category set forth in its unpublished opinion are incorporated. Initially, a reduction of the $14,-130.00 in fees billed in this category to hourly rates consistent with community standards results in adjusted fees of $10,328.50. The difference is disallowed.

The lion's share of the time spent in this category was incurred in July and August 1995 before the decision to sell. Although there are some instances of some excessive time spent (*see, for example*, 2.2 hours of partner time and 0.1 hours of associate time drafting and reviewing OCC bylaws—entries at 07/07/95 – 07/12/95) other than the apparent failure to delegate numerous "monitoring" activities the fees are generally reasonable. The Court will disallow an additional 10% for these failings and will award fees of **$9,295.65** in this category.

#### (6) Category 54—Claims Administration and Objections:

 $6,982.50 in time is billed to Category 54. When reduced to hourly rates consistent with community standards, the time billed to the estate in this category should be $5,193.00. The difference will be disallowed.

In this category, L & O supposedly reviewed the claims asserted against the estate, including those of Shawmut. Pursuant to an interim order authorizing use of cash collateral entered September 27, 1995 (Document No. 272) the OCC had 60 days from the entry of the order to file objections to Shawmut's secured claim. (The Debtor had already waived all such objections as a condition of cash collateral usage.) Sixty days from September 27, 1995 was November 27, 1995. Sometime in mid-November 1995 L & O commenced reviewing the Shawmut claim (*see* entries 11/16/95, *et seq.*) and the effort was Herculean. Fifty-four percent of the time spent in this category was spent in November 1995. However, much of it was "a day late and a dollar short."

On November 27 itself—the last day to file the objection—L & O billed 0.5 hours of partner time, 4.7 hours of associate time and 0.2 hours of paralegal time totaling $731.00 at adjusted rates in activities such as "review/revise letter to Committee regarding Shawmut's claim and sufficiency of description of collateral" and "analyze perfection of Shawmut's security interest and availability of bankruptcy avoiding powers against Shawmut". Not only did L & O belatedly start researching challenges to this claim in earnest on the date the objection was due, it continued thereafter *past* the November 27 deadline, billing additional time on November 28 and November 29. To the Court's knowledge, there was no written stipulation nor court order extending this deadline to object. The firm could have had no reasonable expectation that services rendered this late in the case would confer a benefit upon its constituency. Accordingly the Court reduces the adjusted fees in this category by 50% awarding $2,596.50. The balance will be disallowed.

### (7) Category 56—Fee/Employment Applications:

██ L & O's fee application represents that this category reflects time billed for the purpose of getting the firm employed as counsel for the Committee. Once again, this category may reflect an artificial distinction from Category 57. In reviewing the actual time entries in Category 56, the firm spent a lot of time doing that which is most basic; researching the U.S. Trustee Guidelines (*see* entries 07/10/95, 08/18/95) applying to be employed (*see* entries 07/06/95 – 07/28/95) and figuring out how to get paid on an interim basis (*see* entries on 07/28/95).

This category does not include $1,987.00 (at pre-adjustment rates) of time billed in Category 57, responding to the questions from the United States Trustee's Office and replying to the Debtor's objection to L & O's employment (which objections were ultimately postponed by stipulation). When the Category 56 work is added to Category 57 work, even at rates consistent with community standards, a total of $5,092.50 was billed merely to get the firm employed—an amount which is excessive and not reasonably necessary to the task.

Recalculating Category 56 fees to amounts consistent with community standards results in the $3,839.00 requested in this category being reduced to $3,105.50. The difference will be disallowed as excessive. Further, the adjusted amount will be reduced by 50% because of the unreasonably excessive nature of the fees incurred in this activity. Accordingly, a fee of $1,552.75 is allowed in Category 56; the balance is disallowed.

### (8) Category 57—Fee/Employment Objections:

An analysis of the activities in this category is contained in Category 49 above.

### (9) Category 58—Financing:

██ The Court incorporates comments regarding Category 58 from the attached unpublished opinion. In addition to those comments, the Court observes that 58% of all the fees billed to this category were billed in September 1995—after the decision to sell all assets had been made. L & O trumpets the time spent as necessary to correct "serious deficiencies" in the cash collateral order and the financing stipulation with Shawmut. Indeed, significant amounts of time were spent by L & O to avoid having the Court be ". . . deprived of the opportunity to determine whether . . . a plan provid[ing] a more favorable *offer for the purchase of substantially all of the assets of the Debtor's estate than other offers made for the purchase of the Debtor's assets in connection with the sale proceedings which were then pending [could be produced]." (Fee Application at 30:6–9.) This *quixotic activity is precisely why the Court stood willing to convert this case to one under Chapter 7 when OCC counsel refused to agree to the terms of the continuing financing stipulation. As observed by the BAP, L & O continued to incur fees based on a potential optimum recovery when it was painfully obvious that a quick sale of the assets was the best hope. Arguing about the terms of some hypothetical plan was akin to arguing about the number of angels dancing on the head of a pin.

In addition to grossly excessive billing in September 1995, the Court notes that L & O apparently violated the terms of its stipulation with the Debtor postponing consideration of objections to its employment. Pursuant to that stipulation, L & O agreed not to bill the estate for more than one trip to San Diego during any one month. Category 58 shows lumped time entries for "preparation and attending hearings" on 09/13/95, 09/19/95 and 09/20/95 totaling $6,324.00 (or $4,557.00 when adjusted to hourly rates consistent with community standards).

Based on the foregoing comments, the Court makes the following reductions. First, in adjusting Category 58 fees to hourly rates consistent with community standards, gross fees in this category will be reduced from $37,884.50 to $27,710.50. Of the approximately $16,594.00 in adjusted fees billed in September 1995, the Court disallows 75% or $12,445.50 as unreasonable and excessive.

Although the Court has focused its comments on September 1995 billings, this is not to be construed as approving pre-sale billings in this category. They too reflect "overkill." For example, L & O objected to the form of the Debtor's proposed order authorizing the use of cash collateral submitted after the July 7, 1995 hearing. It produced a five page objection most of which quoted the transcript of the hearing and pointed out how the proposed order deviated from the Court's ruling at that hearing. 7.5 hours of partner time and 4.9 hours of associate time or $3,334.00 in fees ($2,450.00 at community standards) was spent to produce that objection. (*See* entries 07/19/95 – 08/04/95). Based on the foregoing, the Court reduces the approximately $11,116.50 in non-September 1995 time by 40%, disallowing $4,446.60 and allowing $6,669.90. In summary, the firm will be awarded **$10,818.40** in fees in Category 58 with the balance disallowed as excessive.

### (10) Category 59—General Litigation:

 Other than to reduce the charges in this category to reflect rates consistent with community standards, the Court makes no adjustments to this category. The sum of $883.00 is allowed with the difference disallowed.

### (11) Category 60—Meetings of Creditors:

Other than a reduction of the fees charged to hourly rates consistent with community standards, the Court makes no adjustment to these fees. Fees totaling **$1,445.50** will be awarded and the balance disallowed.

### (12) Category 61—Plan and Disclosure Statement:

 Over 90% of the fees billed in this category were incurred after the decision to sell the Debtor's assets. For the reasons stated in the attached unpublished decision and apparently concurred with by the BAP, the Court disallows the entire amount as unreasonable and unnecessary services. Accordingly, the Court awards no fees in this category.

### (13) Costs:

 The firm requests $10,746.50 in costs. It is impossible to develop an appropriate methodology to review the reasonableness of costs when they are not attributed to each category in which services were rendered. It is axiomatic that unnecessary services run up unnecessary costs. Although 61% of the costs charged to this estate were incurred after the decision to sell the estate's assets, the Court has concluded that there were unnecessary services both before and after that date. A percentage reduction of costs based on the ratio of fees requested to fees allowed appears to be a principled method to make an adjustment to the costs. However, in this case, applying this method is complicated by the fact that the Court has also reduced L & O's hourly rates to ones consistent with community standards which has the effect of increasing the percentage of reduction. Because of this, the Court concludes that a percentage derived from the ratio that the gross amount of adjusted fees ($93,564.50) bears to the fees actually awarded ($43,078.33) is a fairer basis for reduction. As the fees awarded are 46% of the fees requested (at reduced rates), the Court awards 46% of the costs or $4,943.39. The

balance will be disallowed for the reasons stated above.

In summary, for the reasons set forth above and in the attached unpublished Memorandum Decision, the Court awards the following:

| | |
|---|---|
| Category 49/57 | $ 4,826.66 |
| Category 50 | 457.50 |
| Category 51 | 4,691.00 |
| Category 52 | 6,511.37 |
| Category 53 | 9,295.65 |
| Category 54 | 2,596.50 |
| Category 56 | 1,552.75 |
| Category 58 | 10,818.40 |
| Category 59 | 883.00 |
| Category 60 . | 1,445.50 |
| Category 61 | 0.00 |
| **TOTAL** | **$43,078.32** |

Of the $10,746.50 in costs sought, the Court awards $4,943.39.

Ironically, by making specific adjustments in each category, it appears the Court may have been overgenerous to L & O in the first instance by awarding the firm the $50,000 which was the stipulated amount by which Shawmut agreed to subordinate its lien in favor of OCC counsel. The $1,978.29 difference is ordered disgorged by the firm to the Chapter 7 trustee for distribution to the PMSI creditors in the same proportions as the earlier sums disgorged by L & O.

This Memorandum Decision is in lieu of findings of fact and conclusions of law. The Court will prepare a separate order in accordance with this Memorandum Decision.

### EXHIBIT "A"

### MEMORANDUM DECISION

Lobel & Opera ("L & O") has made a first and final application for compensation and reimbursement of expenses as attorneys for the Official Creditors Committee ("OCC") in this Chapter 11 case. The application asks this Court to award $137,033.50 in fees and

---

1. Under an interim compensation arrangement, the firm has already been paid $93,514.55.

2. The debtor's cash collateral motion filed June 21, 1995 disclosed a $5,500,000.00 obligation to APC's primary lender Shawmut. Additionally, it had purchase money security interest creditors in inventory of at least $1,903,747.00, reclamation creditors of $401,640.00 and potentially

$11,134.94 in costs.[1] The application is not opposed by any party.

Auto Parts Club, Inc. ("APC") was a chain of retail warehouse-type stores selling automobile parts and accessories. The company unsuccessfully attempted to emulate the formula of Price/Costco. Its lack of success in doing so required the filing of a voluntary petition under Chapter 11 on June 19, 1995. An OCC was appointed on July 26, 1995 by the United States trustee. Two days later, Mr. Opera of the firm attended a meeting of the committee at which presumably it was decided to employ the firm as counsel.

APC came into Chapter 11 with an enormous debt load and an extended history of losses.[2] From the earliest stages of the case, it was apparent that the debtor's last best hope was to sell its assets.

It is against this background that the Court evaluates the fee request of L & O. L & O's fee request is one based on the lodestar principle. Under application of that principle, the firm would be entitled to a fee equal to the hours worked multiplied by the hourly rate. *In re Yermakov*, 718 F.2d 1465, 1471 (9th Cir.1983).

Adjustments to the fee calculated under lodestar may be made when the court does the evaluation required by 11 U.S.C. § 330. That evaluation includes asking the questions:

(1) Are the services which are the subject of the application properly compensable as legal services?

(2) If so, were they necessary and is the performance of the necessary tasks adequately documented?

(3) If so, how will they be valued? Were the necessary tasks performed within a reasonable amount of time and what is the reasonable value of that time?

---

avoidable trade debt secured by a lien (the "MEMA" debt) of $191,235.00. (Motion at 11–14.) According to the Declaration of John Tolle in Support of Shawmut's Opposition to the Debtor's Motion to use Cash Collateral filed June 22, 1995, APC lost $46,334,000.00 from 1989–94. (Declaration at 4:1–2.)

*Unsecured Creditors' Committee v. Puget Sound Plywood, Inc.,* 924 F.2d 955, 957–58 (9th Cir.1991).

In the *Unsecured Creditors' Committee* case, the bankruptcy court rejected a lodestar approach to awarding fees for the creditor committee counsel where the requested fees were higher than the recovery. The trial court instead awarded fees as though the counsel had been employed on a contingent fee basis, noting that the majority of the legal services were rendered in connection with a highly contingent objection. In affirming the bankruptcy judge's ruling, the Ninth Circuit rejected the disappointed counsel's claim that lodestar is the exclusive method of calculating fees under § 330:

> Although *Manoa* suggests that starting with the 'lodestar' is customary, it does not mandate such an approach in all cases. Moreover, *In re Yermakov* [citation omitted], states that calculating the 'lodestar' is the 'primary' method for calculating fees; 'primary' is not a synonym for 'exclusive.'

*Unsecured Creditors' Committee* at 960.

Preliminary to analyzing the reasonableness of the L & O fee request, the Court observes that the firm appears to have complied with U.S. Trustee Guideline No. 4 requiring services be segregated by category and the nature of the services in that category generally described in a narrative. Categories in which L & O rendered the greatest percentage of services include the following:

(1) *Category 49—Fee/Employment Applications of Other Professionals:* From its title, one would assume that services in this category related to analysis of applications to be employed or compensated by professionals other than L & O. Indeed an examination of the detailed entries in Category 49 supports the observation that much of the astronomical total of $15,404.00 or 11% of the fees requested was spent in examining the debtor's proposed intention to employ a number of special consultants and apparently in negotiating the terms of the employment of some. However, also included in this category are 15.7 hours of paralegal time and 1.1 hours of partner time (at $340/hour) in trying to employ a financial consultant "for no fee" to the debtor! Further, in this category L &

O has billed 13.9 hours of lawyer (partner and associate) time for not only reviewing the debtor's proposal to permit interim compensation of professionals but also figuring out how L & O could be included in that process. (For example, see entries 08/09/95 – 08/18/95.)

(2) *Category 51—Asset Disposition:* According to the narrative, L & O tried to act as an intermediary between the debtor and its primary lender Shawmut to arrive at a consensual approach to reorganization. But as stated in Mr. Opera's declaration,

> Faced with operating losses so severe as to imperil the Debtor's continuing operations, after extensive negotiations, on or about August 30, 1995, representatives of the Debtor, the Committee, and Shawmut Capital Corp. ('Shawmut') reached agreement that it would be in the best interest of the debtor and the debtor's creditors for the debtor to seek to sell and to assign substantially all of its assets, and thereby attempt to preserve any going concern value of the debtor's business.

First and Final Application for Compensation and Reimbursement of Expenses of Lobel & Opera, filed January 4, 1996 at 9:21–26.

Despite its realization that sale was in the best interest of the estate by August 30, 1995, L & O rendered another $19,583.00 in services after that date in Category 51 or 71% of the $27,533.00 total.

(3) *Category 53—Case Administration:* Since counsel for the OCC had no responsibility for administering the case, the title of this category of services' is somewhat misleading. $14,187.00 or roughly 10% of the total requested is billed to this category. Essentially, Category 53 is one in which L & O has aggregated miscellaneous administrative services to its client the Official Creditors Committee. In this category are services such as conferring with OCC members both by telephone and in person. However, also included in this category are numerous "monitoring" activities requiring no particularly specialized skills. The Court makes this observation because $12,614.00 or 89% of the fees requested in this category are billed

at the hourly rate of $340/hour, the highest rate charged by L & O in this case.

(4) *Category 58—Financing:* This is the single largest category of fees requested. $37,844.50 or 28% of the total fees incurred by L & O are assigned to this category. As observed above, a decision to sell the debtor's assets had been made by the debtor, the OCC and Shawmut by August 30, 1995. However, $23,294.00 or 62% of the fees in this category were incurred after that decision was made. The Court will discuss the reasonableness of this action later in this opinion.

The foregoing discusses only those categories in which substantial fees were incurred. There are others in which reasonableness is nevertheless an issue.

Because of the enormous secured debt against this debtor's assets, sale proceeds are insufficient to pay all pre-petition secured creditors and post-petition secured creditors in full. The estate appears to be administratively insolvent. There will be no distribution to unsecured creditors. The source of payments to most professionals in this case has been the revolving secured line of credit extended by Shawmut to the debtor which permitted the debtor to use money borrowed post-petition to pay professionals. (See Stipulation Among Debtor, the Official Committee, etc., filed September 20, 1995, at 7–8, ¶ 1.7.) Of course, to the extent the debtor used monies for this purpose, it drew down on the line of credit from which it also was supposed to pay other operating expenses.

In addition to the magnitude of fees incurred without any benefit to the unsecured creditors of this estate, the Court is troubled by the fact that 58% or $79,060.00 of those fees were incurred *after* the decision was made to sell the debtor's business. It is important to understand that the conclusion to sell the debtor's business was arrived at with the assistance of Buccino & Associates who acted as the debtor's turnaround consultant with the blessing of Shawmut. Once the

decision to sell was made, the debtor employed Houlihan, Lokey, Howard & Zukin ("Houlihan, Lokey") as its investment banker to market the debtor's assets and obtain overbids. Both of these professionals were paid substantial amounts of money by this estate for these services.

When the Court questioned Mr. Opera about services rendered after the conclusion that an asset sale was necessary, he stated that he thought there was a realistic possibility of getting something in excess of $8–9 million for these assets.[3] Even if this were so, based on the amount of virtually unassailable secured debt against these assets, it was unlikely that Mr. Opera's constituency would have realized any recovery at that price after payment of other administrative claims. There is no showing that L & O exercised any restraint in incurring fees once the decision to sell the assets was made. Indeed, the contrary appears to be true.

Although the services of L & O are properly compensable as legal services and adequately documented, they are not reasonable because they were not necessary. This is particularly so in view of the final benefit to the estate's creditors.

*In re Kitchen Factors, Inc.,* 143 B.R. 560 (9th Cir. BAP 1992) supports the proposition that the lodestar method may be abandoned in favor of alternative approaches where, "The detail of time spent by counsel is not helpful because it is grossly disproportionate to the amounts at stake." *Id.* at 562. Although that case involved trustee's counsel expending $12,000 in fees to collect a $12,000 debt of which $6,000 was eventually recovered, the *Kitchen Factors* opinion is instructive as to the duty of counsel where the estate's money is being spent:

> If the trustee [or debtor in possession] insists on pursuing collection efforts in a manner which is not cost-effective, then counsel should seek to withdraw....

*Id.* at 563.

While withdrawal may not have been the only option to L & O, certainly the firm

---

**3.** He did not share with the Court on what he based his assessment that there was such a "realistic possibility."

should have drastically scaled back its activities in light of the remoteness of any recovery for the unsecured creditor body. As I find this request so grossly disproportionate to the benefit conferred on the estate and therefore not actual and necessary, I am reducing the firm's fee request to that amount by which Shawmut agreed to subordinate its lien in favor of OCC counsel:

> Lender hereby subordinates its lien to the payment of such fees and costs up to the amount of $50,000 for counsel to and expenses of Committee as set forth above. . . .

Stipulation Among Debtor, the Official Committee, etc., filed September 20, 1995 at 8:8–10, ¶ 1.7.

The balance of the monies received by the firm under the interim compensation arrangement or $43,514.55 should be returned to the estate for distribution in accordance with the debtor's agreements with secured creditors.[4] As observed by *Matter of Taxman Clothing Company*, 49 F.3d 310 (7th Cir.1995).

> The result is harsh. But being a creditor and seeing your claim getting eaten by a lawyer is a harsh fate as well. Even after the passage of 11 U.S.C. § 330(a)(1), bankruptcy is not intended to be a feast for lawyers. As we read *In re Toney*, 171 B.R. 414, 415 (Bankr.S.D.Fla.1994), 'absent extraordinary circumstances, bankruptcy estates should not be consumed by the fees and expenses of court-appointed professionals.'

*Id.* at 316.

Costs requested of $11,134.94 (the lion's share of which are photocopies totalling $3,003.55 and facsimile charges totalling $5,584.00) reflect similar "overkill" with respect to the services of counsel for the OCC. While the expenses are in an amount permitted by the United States Trustee Guidelines, the Court cannot find that they are actually necessary in light of the above ruling. They will be included in the $50,000.00 L & O is

permitted to retain and no separate award will be made for costs.

This Memorandum Decision is in lieu of findings of fact and conclusions of law. L & O's counsel is directed to prepare an order in accordance with this Memorandum Decision within ten (10) days of the date of entry. Dated: August 6, 1996.

---

4. According to L & O's first and final application filed January 4, 1996, the firm has been paid $93,514.55 by the debtor as and for its fees and

costs under the interim compensation procedure order. Application, p. 3:1.