251 B.R. 103 (2000)
In re MEDNET, MPC Corporation, Medi-Mail, Inc., Medi-Claim, Inc., Debtors.
Roberts, Sheridan & Kotel, P.C., Appellant,
v.
Bergen Brunswig Drug Company, Appellee.
BAP No. NV-99-1667-DRYMA. Bankruptcy Nos. S-97-25800-LBR to S-97-25802-LBR.
United States Bankruptcy Appellate Panel of the Ninth Circuit.
Argued and Submitted May 18, 2000.
Decided July 10, 2000.
*104 Peter C. Moskowitz, C. Stanley Hunterton, Hunterton & Associates, Las Vegas, NV, for Roberts, Sheridan & Kotel.
Richard F. Holley, James, Driggs, Walch, Santoro, Kerney, Johnson & Thompson, Las Vegas, NV, for Bergen Brunswig Drug Co.
Before DONOVAN,[1] RYAN, MARLAR, Bankruptcy Judges.

OPINION
DONOVAN, Bankruptcy Judge.

OVERVIEW
The law firm of Roberts, Sheridan & Kotel, P.C. (RSK), special counsel for the Debtors, appeals the bankruptcy court's order entered on October 1, 1999 denying RSK full compensation of its requested fees. We AFFIRM.

*105 STATEMENT OF FACTS

1. RSK's employment
RSK submitted its application to be retained as special counsel for the Debtors on July 31, 1997. Prior to approval, the court expressed its reservations about RSK's role in the case and held a hearing on August 25, 1997 to determine why it was necessary for three law firms to represent the Debtors: general bankruptcy counsel (Gibbons, Del Deo, Dolan, Griffinger & Vecchione (Gibbons)), local counsel (Shea & Carlyon (S & C)), and RSK as special counsel. In response, RSK urged that its employment was in the best interest of the estate because RSK had represented Mednet for a considerable time as its general counsel prior to bankruptcy. RSK assured the court that RSK's special counsel work would be limited specifically to matters relating to the Debtors' pre-petition litigation with Appellee Bergen Brunswig Drug Company (Bergen), the Debtors' largest creditor and subsequently DIP lender, and the nine other pre-petition lawsuits RSK had been defending on the Debtors' behalf. In addition, RSK specifically represented to the court that it would avoid duplicating the services of Debtors' other counsel. The court approved RSK's employment and ordered the firm to prepare a projected budget. Five months later RSK filed with the court a Fee and Cost Summary, a two-page document in the form of a table, generally identifying project categories and estimating hours to be billed in each category, but the summary provided no information concerning fee or cost breakdowns. The budget was not served on other counsel in the case, was not set for hearing, and RSK did not seek court approval of the summary.
2. Interim fee application
In early 1998, RSK and five other professionals approved by the court filed interim fee applications. RSK had received a retainer in the amount of $100,000 from Medi-Mail, Inc., immediately prior to the Debtors' bankruptcy petitions from which RSK had "drawn down" $58,361.23 for payment of pre-petition expenses. RSK's interim fee application sought an award of $194,856.50 in fees and $9,066.14 in expenses, for a total of $203,922.64 for the period of July 31, 1997 through December 31, 1997. Bergen objected generally to the aggregate amount of fees and asked the court to hold back 25% of all professional fees requested. In response to Bergen's objections, three of the professionals, including RSK, agreed to a 20% hold back. On April 2, 1998, the court made an interim award to RSK representing 80% of its requested fees and 100% of its costs, for a total of $164,951.34. Including the fees earned with the retainer, up to the date of the interim award, RSK received a total of $223,312.57.
3. Expanded scope of employment
On March 30, 1998, based on an ex parte application, the court entered an order expanding the scope of RSK's employment to include the defense of a lawsuit against two officers of the Debtors, Messrs. Warren and Smith.
4. Final fee application
On September 11, 1998, RSK filed a final fee application covering services from the period of January 1, 1998 to August 25, 1998. This application sought award of an additional $398,155.83, consisting of $377,622 for fees and $20,533.83 for expenses. Bergen and the Official Committee of Unsecured Creditors (Committee) objected to RSK's application. The hearing on all professionals' fee applications was held on October 15, 1998. At that hearing, the court ruled on all other fee applications but took RSK's fee application under advisement pending receipt of supplemental documentation. On April 23, 1999, the court heard further oral argument on RSK's application. At the conclusion of the hearing, the court requested a supplemental affidavit from Gibbons, or the Debtor, or "from somebody that had the ability to give [RSK] authority to do *106 [the work]" to establish whether it was indeed true that the Debtors had authorized RSK's services. On May 28, 1999, RSK filed an affidavit of Robert Bagdasarian, former chief executive officer of the Debtors, stating that all of the work performed by RSK was authorized. On October 1, 1999, the court entered a 17-page order outlining its reasons for allowing RSK a total of $324,344 in final fees and costs for all of its work on the case and denying RSK a total of $277,734.02 of the $602,078.47 in fees and expenses requested.

ISSUES ON APPEAL
1. Whether the bankruptcy court applied the correct legal standard when it disallowed a portion of RSK's fees and expenses as unauthorized, duplicative, unnecessary, or not reasonably likely at the time they were rendered or incurred to benefit the Debtors' estate.
2. Whether the bankruptcy court abused its discretion when it disallowed RSK the full amount of compensation requested.

STANDARD OF REVIEW
A bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed de novo. In re Park-Helena Corp., 63 F.3d 877, 880 (9th Cir.1995). The court's disallowance of attorney's fees will not be disturbed on appeal absent an abuse of discretion. Id. The legal standard used by a bankruptcy court to determine the allowance of fees involves statutory interpretation and construction of 11 U.S.C. § 330(a)[2] and is therefore reviewed de novo. In re Nucorp Energy, Inc., 764 F.2d 655, 657 (9th Cir. 1985); In re Auto Parts Club, Inc., 211 B.R. 29, 32 (9th Cir. BAP 1997); In re CIC Inv. Corp., 192 B.R. 549, 551 (9th Cir. BAP 1996); In re Dutta, 175 B.R. 41, 43 (9th Cir. BAP 1994); In re Stewart, 157 B.R. 893, 895 (9th Cir. BAP 1993).

DISCUSSION
Section 330(a)(1) authorizes "reasonable compensation for actual, necessary services rendered" by a professional.[3] Section 330(a)(2) authorizes a court to award compensation that is less than the amount of compensation requested. Section 330(a)(3)(A) outlines factors a court should consider when determining what is reasonable compensation for services rendered.[4] In addition, § 330(a)(4)(A) outlines when compensation should not be allowed.[5]
*107 1. Applicable standard
RSK appears to question the legal standard employed by the bankruptcy court in disallowing portions of RSK's fees and expenses. In order to review whether a bankruptcy court has improperly denied a professional its claimed compensation, it is necessary to determine whether such services were reasonable, actual, and necessary. § 330(a)(1)(A). A reviewing court also must determine whether the bankruptcy court considered whether the services rendered were "reasonably likely to benefit the debtor's estate." § 330(a)(4)(A). We recognize that there is a split of authority as to what legal standard should be used to determine whether services are "necessary" or "beneficial" to the estate. Because this problem requires statutory interpretation, we review de novo whether the bankruptcy court applied the correct legal standard.
The divergent approaches to the application of § 330 are highlighted by decisions of the Second and Fifth Circuits. The Second Circuit has held that the test for determining whether counsel is entitled to compensation is whether counsel's services were reasonably likely to benefit the debtor's estate, not whether counsel is able to show actual benefit to the estate. In re Ames Dep't Stores, Inc., 76 F.3d 66 (2nd Cir.1996). The court reasoned that in enacting § 330, Congress moved away from the doctrine of "economy of administration" and that with the 1994 amendments, Congress specifically moved further towards greater equity in estate management by providing that fees might be awarded when the services were "beneficial at the time . . . rendered." Id. at 71 (citing § 330(a)(3)(C)). The Second Circuit opined that this reasoning comports with "the statute's aims that attorneys be reasonably compensated and that future attorneys not be deterred from taking bankruptcy cases due to a failure to pay adequate compensation." Id. at 72 (citing In re UNR Indus., Inc., 986 F.2d 207, 210 (7th Cir.1993)).
The Fifth Circuit takes the opposite view. In In re Pro-Snax Distributors, Inc., 157 F.3d 414 (5th Cir.1998), the court held the test to determine whether attorneys' services are compensable for work done as counsel for an involuntary debtor (in a case converted from a chapter 7 to a chapter 11 and then reconverted to chapter 7) before and after the appointment of a chapter 11 trustee is whether the work resulted in identifiable, tangible, and material benefit to the bankruptcy estate. Id. at 426. The Fifth Circuit was "disinclined to hold that any service performed . . . need only be reasonable to be compensable," but held that such services must also be of a material benefit to the estate. Id.
The Ninth Circuit in In re Century Cleaning Services, Inc., 195 F.3d 1053 (9th Cir.1999), acknowledges the Ames and Pro-Snax decisions and concludes that a chapter 7 debtor's attorney is entitled to compensation for work done after conversion of a chapter 11 case. The Ninth Circuit did not, however, address the issue of what test to apply when evaluating whether services should be compensated.
A Ninth Circuit BAP decision addresses this question. In In re Auto Parts Club, Inc., 211 B.R. 29 (9th Cir. BAP 1997), we approved the bankruptcy court's ruling that the attorneys for the Committee were not entitled to compensation for work done to advance the debtor's chapter 11 case after the decision was made to sell the debtor's business. Id. at 34. The bankruptcy court had concluded that the attorneys' failure to scale back their services was unreasonable; that the fee application was "grossly disproportionate to the benefit conferred on the estate"; and that the requested costs "reflected `overkill'" and were not "actually necessary." Id. at 32. On appeal, the panel noted that the appellant was "correct in stating that the standard is an objective one as to whether the fees were reasonable and necessary at the time they were incurred." Id. at 35. The panel vacated and remanded the case because the bankruptcy court had not made *108 sufficient findings to support its fee decision. Id. at 36.
We believe that the Second Circuit analysis and the panel's analysis in Auto Parts were correct and that the plain language of the statute is clear. We assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry "their ordinary, contemporary, common meaning." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership, 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (citing Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)). Section 330(a)(3)(A)(C) clearly states that the question governing attorney compensation should be whether services were necessary or beneficial "at the time at which the service was rendered."[6] The Fifth Circuit reasoning that a professional's services are only compensable if they result in a material benefit to the estate does not comport with a strict reading of the statute. Section 330 clearly states that (1) services are compensable if they were "necessary . . . or beneficial at the time at which the service was rendered," and (2) services should not be compensable if they were not "reasonably likely to benefit the debtor's estate." § 330(a)(3)(A)(C) and (a)(4)(A)(ii)(I). The statute does not require that the services result in a material benefit to the estate in order for the professional to be compensated; the applicant must demonstrate only that the services were "reasonably likely" to benefit the estate at the time the services were rendered. The statute is clear and unambiguous. In our view, the Fifth Circuit's reading of the statute does not comport with the clear meaning of the 1994 amendments, would unreasonably restrict legitimate professional efforts toward effective estate administration, and could well cause attorneys to shy away from work that might benefit the estate. We therefore respectfully reject the Fifth Circuit's view.
A bankruptcy court also must examine the circumstances and the manner in which services are performed and the results achieved in order to arrive at a determination of a reasonable fee allowance.
Such examination, in general, should include the following questions: First, were the services authorized? Second, were the services necessary or beneficial to the administration of the estate at the time they were rendered? Third, are the services adequately documented? Fourth, are the fees requested reasonable, taking into consideration the factors set forth in § 330(a)(3)? See Unsecured Creditors' Comm. v. Puget Sound Plywood, Inc., 924 F.2d 955, 957-58 (9th Cir.1991). Finally, in making this determination, the court must take into consideration whether the professional exercised reasonable billing judgment.[7] As stated in In re Riverside-Linden *109 Investment Co., 925 F.2d 320, 321 (9th Cir.1991), "[w]hen a cost benefit analysis indicates that the only parties who will likely benefit from [a service] are the trustee and his professionals," the service is unwarranted and a court does not abuse its discretion in denying fees for those services (citation and internal quotation marks omitted).
Based on our examination of the record, we conclude that the bankruptcy court employed the appropriate standard under § 330 in arriving at its determination of a proper fee allowance. We turn now to an examination of specific factual issues raised by RSK's appeal.
2. Factual issues raised by RSK's appeal
We begin by acknowledging that we should uphold a bankruptcy court's factual findings regarding a professional's fee application absent the conclusion that the bankruptcy court abused its discretion or applied an erroneous legal standard. In re Hanson, 172 B.R. 67, 69 (9th Cir. BAP 1994) (citing In re Reimers, 972 F.2d 1127, 1128 (9th Cir. 1992)). The appellant contends that the bankruptcy court's disallowance of 46% of RSK's fees and expenses constitutes an abuse of discretion and is reversible error. RSK believes that (1) its services met the requirements of § 330(a) and (2) the court's decision to reduce RSK's fees was premised on mistakes of both fact and law. RSK challenges the bankruptcy court's disallowance of compensation for much work that RSK believes benefitted the estate. We will address each of RSK's factual challenges in turn.
a. Preserving the NOLs
RSK challenges the court's disallowance of RSK's fees by describing the work it did to preserve the Debtors' $65 million in net operating loss carry forwards (NOLs) which, RSK contends, would have been lost without RSK's expertise. RSK contends that the court abused its discretion when it denied RSK fees for this work because RSK expended significant time and resources that were necessary to preserve the NOLs' value. RSK stresses that both Bergen and the Committee repeatedly represented to the court that the NOLs were necessary to the administration of the estate and never objected to the work RSK did. While it is undisputed that it was in the best interest of the estate to preserve the NOLs, the issue here is whether the fees charged were inappropriate or excessive under the circumstances.
The bankruptcy court found that RSK's interim fee application contained entries for pre-petition NOL work for which RSK already had been paid $20,000. The court also found that RSK's work duplicated work performed by Bergen's accountants, that the NOL legal authorities submitted by RSK were not particularly helpful to the court, and that in the process RSK charged attorneys' rates for secretarial tasks. The court also noted its viewpoint that the NOL hearing during the later fee period did not entail very much work and that RSK failed to demonstrate that the work for which RSK sought compensation was reasonably likely to benefit the estate at the time it was performed. In its final analysis, the bankruptcy court concluded that RSK's fees charged to this project were excessive. Professionals always must exercise proper billing judgment. In re Auto Parts Club, Inc., 211 B.R. at 33 (citing Puget Sound, 924 F.2d at 959). The court here reasonably found RSK had not done so.
b. Collecting receivables
The second category for which RSK contends it was improperly denied compensation was that of identifying and collecting receivables. RSK urges that the court abused its discretion by denying RSK $74,952.50 in fees when RSK billed only $246,000 for (1) identifying $3.2 million in pre-petition receivables; (2) collecting $2.275 million; (3) commencing three adversaries to collect an additional $418,761.38, *110 which as of the time RSK prepared its final fee application it expected to settle for $310,000; and (4) working with the Debtors to locate records to commence three more adversary proceedings to recover another $210,131.21.
The bankruptcy court concluded, however, and the record supports, that the applications in connection with these fees contained little meaningful description of RSK's work. The court also found specifically that information gathering could have been done by lower paid associates rather than partners and that for those entries that did offer an explanation of services rendered, an inordinate amount of time was charged. After a close look at RSK's time entries, the court noted that RSK spent more time documenting negotiated settlements than it spent in settling the disputes.
In addition, the court concluded that an excessive amount of time was devoted to some of RSK's receivables work. For example, in connection with the Metropolitan Water litigation, the court noted that RSK's partner, Mr. Sullivan, had refused to participate in the preparation of a joint discovery plan. The court also observed that many of RSK's litigation costs seemed to be attributable to what the court perceived to be Mr. Sullivan's problem in "getting along well with others."
In connection with the Detroit Board of Education litigation, the court felt that RSK billed extensively for drafting a motion for a default judgment that was never filed with the court. While RSK acknowledges the motion was prepared prior to receipt of all responses, the fact remains that all defendants answered the complaint. The court properly found the work on the motion to be unnecessary.
In the end, and after a detailed receivable by receivable analysis, the court found that a substantial amount of the time RSK spent was excessive, unreasonable, and unwarranted under the circumstances. We see no basis to conclude that the bankruptcy court abused its discretion in that regard.
c. The ValueRx litigation
The third category of work at issue is in connection with the ValueRx litigation. RSK contends that the court erred by disallowing all of the fees requested by RSK in the interim application. The court concluded that RSK spent an inordinate amount of time in connection with this litigation, researching bankruptcy issues that the court reasonably believed could have been addressed more economically by bankruptcy counsel. For example, the court concluded that issues regarding the effect of the stay, core and non-core jurisdiction, and statutes of limitations all could have been answered quickly by bankruptcy counsel and that RSK's time devoted to such issues therefore was unnecessary. In addition, the court found that RSK spent many hours preparing a summary judgment motion that it had no authority to prepare and that was never filed. The court also was unconvinced by RSK's assertion that this work was done in order to have "the ball ready to move forward." RSK argues that the work was necessary and that bankruptcy counsel did not know the answers to the questions it was researching. These claims are unsupported by the record. It was therefore not unreasonable for the bankruptcy court to conclude that bankruptcy counsel could and should have advised RSK on elementary bankruptcy issues, such as the effect of the automatic stay on pending litigation, at far less cost to the estate than that incurred by RSK.
d. The Kurtin & DeFay shareholder litigation
The fourth RSK challenge relates to the Kurtin & DeFay shareholder litigation. RSK argues that the court erred in not allowing it full compensation for these services because the court's order entered March 30, 1998 expressly expanded the scope of RSK's employment to allow RSK *111 to defend two officers of the Debtors, Messrs. Warren and Smith. In addition, RSK argues that the court's finding that the Debtors' insurance carrier should have paid RSK for the work is simply not relevant because, RSK believes, it was specifically authorized by the court and its client to perform these services.
RSK overstates the scope of the court's order. The order authorized representation of Messrs. Warren and Smith in connection with the Kurtin & DeFay litigation based on RSK's assurance that such representation was necessary to protect the Debtors. RSK represented to the court that the Debtors owed these officers a pre-petition indemnification obligation and that the Debtors planned to employ these two officers post-confirmation.
Based on RSK's representations, the court signed an order that specifically provided that RSK could represent these officers and other current officers or directors of the Debtor "to whom the Debtor owes a pre-petition indemnification obligation and whom the Debtor intends to employ post-confirmation (if any)." The plan and disclosure statement provided that, upon confirmation, a new board would be appointed by the holders of new common stock and officers of the reorganized Debtors would be appointed by the new board. These provisions would exclude the previous officers of the Debtors who were parties in the Kurtin & DeFay litigation and, if read in connection with the express language of the order, would preclude RSK's employment. The disclosure statement and plan also provided that the Debtors' officers and directors were to be indemnified only to the extent covered by insurance in excess of any applicable deductible. These provisions clearly limited the Debtors' liability and support the court's conclusion that RSK should be compensated, if at all, only by the Debtors' insurance company.
Clearly, the court's intent in allowing RSK to represent Messrs. Warren and Smith was to protect the interests of the Debtors. The court took great care to ensure in its authorization order that RSK's representation would be limited. The record shows the bankruptcy court exercised its discretion reasonably when it denied compensation for unauthorized or unnecessary work.
e. The class action
The fifth category is the class action lawsuit. RSK contends, contrary to the court's finding, that the March 30, 1998 order authorized the representation of Mr. Warren in this case and that the representation was reasonable or beneficial to the Debtors when it was undertaken. However, as discussed above, the authorization order was specifically limited to work done in connection with the Kurtin & DeFay matter. In fact, in that order, the term "shareholder action" is defined as the "Kurtin & DeFay" litigation. No order expanded RSK's authority beyond that limited scope. Additionally, the court found that work for which RSK sought compensation was done before any court authorization.
RSK was denied other compensation for work performed after the disclosure statement was filed because the disclosure statement made clear that the officers in question would not continue in their positions and/or were not necessary to the Debtors' reorganization, rendering RSK's defense of those officers superfluous. The court also observed that it was unclear why the Debtors were asked to pay for RSK's services when the Debtors' insurance carrier was responsible to the Debtors for this expense. These problems support the reasonableness of the bankruptcy court's exercise of its discretion in disallowing these portions of RSK's request for compensation.
f. Miscellaneous
Finally, RSK challenges three miscellaneous disallowances. The first miscellaneous item is the court's denial of $1,217 of RSK's fees for the work performed after *112 January 1, 1998 in connection with the collection of a receivable from Managing Underwriters, Inc. RSK asserts that the court abused its discretion when it disallowed these fees. The court order said that since the claim had been resolved during the interim fee period, the fees cited in the final fee application "must therefore be in error." RSK contends, however, that during the interim fee period, it had only settled with one entity in the amount of $53,148.88 and that the final fee application covered services to collect the remaining $95,589.40 from a different entity.
As to the latter services, our examination of the record reveals that in its interim fee application, RSK sought compensation for reviewing the Debtors' files and working with the Debtors' staff in order "to collect the remaining receivable from Managing Underwriters in the amount of $95,589.40." In its final fee application RSK, purportedly citing new work, states that after January 1, 1998, "in order to collect the remaining receivable from Managing Underwriters in the amount of $95,589.40" it reviewed documents and worked with the Debtors' officers and employees "to accumulate the back-up documentation needed to establish debtors' claims. Applicant drafted a complaint and is preparing to commence an adversary proceeding." The operative language RSK uses to describe the work it did, in the final fee application, is very similar to that used to describe the work it did in the interim fee application. The work descriptions for the two periods are substantially duplicative. We conclude that the court's exercise of its discretion against allowance of the additional $1,217 requested for services during the latter period was not unreasonable under the circumstances.
RSK also contends the court erroneously denied RSK reimbursement for $8,691.47 in travel expenses. In support of its appeal, RSK claims that RSK's airfare from New York to Las Vegas was less than the amount the court allowed Gibbons and Winthrop & Couchot (attorneys for the Committee). While the court found there was no apparent reason why out-of-state attorneys spent more than two days in Las Vegas for hearings that lasted less than two hours, RSK claims its attorneys attended to other business while in the area such as preparing witnesses, reviewing documents, and attending meetings. As evidence to support these assertions, RSK cites generally to RSK's applications and to Gibbons' and Winthrop & Couchot's lengthy interim and final fee applications filed and ruled on many months before the ruling in question here. Such references are much too general to be helpful. Because RSK failed to point out specific evidence to support its challenge, there is no reasonable way for this panel to confirm RSK's assertions or to conclude that the bankruptcy court abused its discretion in this regard.
The final issue RSK raises is the court's disallowance of $3,000 of RSK's fees in connection with the Debtors' disclosure statement. RSK states that the court ignored the fact that RSK's participation in the disclosure statement drafting process was undertaken at Gibbons' request. This assertion is unsupported by the record. RSK simply cites as evidence its own final fee application and the very general daily task log included in the S & C and Gibbons joint final fee application containing general references to phone conversations with RSK. Absent more specific evidence to support RSK's challenge, we cannot conclude that the bankruptcy court abused its discretion when it disallowed RSK $3,000 for this work.

CONCLUSION
There is no evidence in the record that suggests that Judge Riegle applied an incorrect standard in determining RSK's final compensation. In her 17-page order, Judge Riegle painstakingly outlined her factual determinations to support her conclusions that the services for which she disallowed compensation were not "necessary" *113 or "reasonably likely to benefit the . . . estate." She also found that RSK's billing practices were improper in many instances, RSK's services often were unauthorized, unnecessary, not beneficial, or excessive, and RSK sought compensation for duplicative services, thereby violating RSK's employment application, the court's orders, and the provisions of § 330. For these reasons, we conclude that Judge Riegle did not err in her statutory analysis, and she did not abuse her discretion.
AFFIRMED.
NOTES
[1] Hon. Thomas B. Donovan, Bankruptcy Judge for the Central District of California, sitting by designation.
[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330.
[3] Section 330(a)(1) provides in pertinent part:

[T]he court may award . . .
(A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and
(B) reimbursement for actual, necessary expenses.
[4] Section 330(a)(3)(A) provides:

(A) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including 
(A) the time spent on such services;
(B) the rates charged for such services;
(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.
[5] Section 330(a)(4)(A) provides:

Except as provided in subparagraph (B), the court shall not allow compensation for 
(i) unnecessary duplication of services; or
(ii) services that were not 
(I) reasonably likely to benefit the debtor's estate; or
(II) necessary to the administration of the case.
[6] Section 330(a)(3)(A)(C) provides:

(A) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including 
. . .
(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title. . . .
[7] In Puget Sound, the Ninth Circuit stated that in performing services, the professional is required to evaluate the following:

(a) Is the burden of the probable cost of legal services disproportionately large in relation to the size of the estate and maximum probable recovery?
(b) To what extent will the estate suffer if the services are not rendered?
(c) To what extent may the estate benefit if the services are rendered and what is the likelihood of the disputed issues being resolved successfully?
Id. at 959. The Ninth Circuit concluded: "[The attorney] had an obligation to consider the potential for recovery and balance the effort required against the results that might be achieved. Absent unusual circumstances, an attorney must scale his or her fee at least to the reasonably expected recovery." Id. at 961.