**In re The CIRCLE K CORPORATION, et al., Debtors.**

**Nos. 90–5052–PHX–GBN to 90–5075–PHX–GBN.**

United States Bankruptcy Court, D. Arizona.

May 15, 2003.

Christopher H. Bayley, Snell & Wilmer LLP, Phoenix, AZ, for Circle K Corporation.

Thomas J. Salerno, Squire, Sanders & Dempsey LLP, Phoenix, AZ, for Houlihan, Lokey, Howard & Zurkin, Inc.

## MEMORANDUM OF DECISION AND ORDER

GEORGE B. NIELSEN, Jr.,
Bankruptcy Judge.

The Court has taken under advisement the contested fee application of Houlihan, Lokey, Howard & Zurkin, Inc. ("Houlihan" or "applicant") and the objections of reorganized debtor Circle K Corporation ("Circle K" or "objector"). The purpose of this memorandum is to enter the Court's complete ruling, findings and conclusions.

### I.

Section 330(a) of the Bankruptcy Code governs compensation of officers and professionals. Prior to 1994, section 330(a) provided that:

After notice to any parties in interest and to the United States trustee and a hearing . . . the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a) (1988)

Subsequently, Congress passed the Bankruptcy Reform Act of 1994 (Reform Act).[1] The 1994 revisions only apply to cases filed after the Reform Act's effective

1. The Reform Act renumbered various provisions and substituted the following relevant provisions in section 330:
(a)(1) After notice to the parties in interest and the United States trustee and a hearing . . . the court may award to a trustee, an examiner, a professional person under section 327 or 1103—
(A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and
(B) reimbursement for actual, necessary expenses.
(2) The court may, on its own motion or on the motion of the United States Trustee . . . or any other party in interest, award compensation that is less than the amount of compensation that is requested.
(3)(A) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
(A) the time spent on such services;
(B) the rate charged for such services;
(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed; and
(E.) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.
(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for—
(i) unnecessary duplication of services; or
(ii) services that were not—

date. *U.S. Trustee v. Garvey, Schubert & Barer (In re Century Cleaning Services Inc.),* 195 F.3d 1053, 1056 fn. 2 (9th Cir. 1999). These jointly administered cases were filed in 1990. Further, application of the amendments would not change the analysis. In determining reasonable compensation, courts still must consider time spent on necessary tasks. The time element has been simply moved to new subpart (a)(3) and is included among other factors. These factors were developed over time by the courts. *Cf.* Section 330(a)(3) with *Gill v. Wittenburg (In re Financial Corp. of America),* 114 B.R. 221, 223 (9th Cir. BAP 1990), *aff'd* 946 F.2d 689 (9th Cir.1991) (criteria to be applied includes the time and labor involved; the novelty and difficulty of the questions presented and the experience, reputation and ability of the professional.) *Also see Roderick v. Levy (In re Roderick Timber Co.),* 185 B.R. 601, 605 fn. 3 (9th Cir. BAP 1995).

## II.

## STANDARDS FOR EVALUATION

■ The issue is whether applicant presented sufficient evidence for the Court to resolve whether the final fee application and supporting documentation satisfies minimal standards, thus allowing a determination if the fees are actual, necessary and reasonable. "As the fact finder, the bankruptcy court must evaluate the sufficiency of the evidence provided by the professional in support of the application for compensation.... In every case, a

> (I) reasonably likely to benefit the debtor's estate; or
> (II) necessary to the administration of the case.
>
> .    .    .    .    .
>
> (5) The court shall reduce the amount of compensation awarded under this section by any amount of any interim compensation awarded under section 331, and, if the

court should award fees only to the level proven to be actual, necessary and reasonable." *First Interstate Bank of Nevada N.A. v. CIC Investment Corp. (In re CIC Inv. Corp.),* 192 B.R. 549, 554 (9th Cir. BAP 1996). To this end, the "decisions have consistently recognized that debtors' counsel are required to maintain and present to the bankruptcy court meticulously accurate time records of all services rendered to the estate as a necessary prerequisite to the recovery of attorneys' fees." *In re Nucorp Energy, Inc.,* 764 F.2d 655, 658 (9th Cir.1985).

The rationale for requiring detained fee statements is to "enable the bankruptcy court to fulfill its obligation to examine carefully the requested compensation in order to ensure that the claimed expenses are justified." *In re Nucorp Energy, id.* The principle that detailed records are critical to a Court's analysis has been underscored by the Bankruptcy Appellate Panel:

> When the Code was enacted, Section 330(a) specifically directed courts to consider time spent, as well as the nature, extent and value of services rendered, in evaluating applications for compensation.
>
> Rule 219 also required a person seeking compensation to file an application setting forth a detailed statement of the services rendered and the expenses incurred. Although the Code became effective in 1979, Rule 219 remained in effect until 1983, when new rules were

> amount of such interim compensation exceeds the amount of compensation awarded under this section, may order the return of the excess to the estate.
>
> (6) Any compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application.
>
> 11 U.S.C. § 330(a)(1994).

adopted to supplement the Code. Rule 2016, derived in large part from Rule 219, made clear the need for time records. For the first time, the applicable rule specifically required that the detailed statement accompanying the application for compensation set forth the "time expended," as well as the services rendered and the expenses incurred.

Rule 2016 is clear. An entity seeking compensation must submit a detailed statement of the time expended along with the fee application.

*In re Roderick Timber Co.,* 185 B.R. at 605.

In *Roderick,* applicant served as both trustee and attorney for the estate. As trustee, applicant failed to keep meticulous time records. Denying the interim application, the Panel held:

> The Application demonstrates that Levy performed numerous services on behalf of the estate. However, the Application fails to demonstrate the time expended as required by Rule 2016. Based on this record, the Panel finds the Application inadequate such that interim fees should not have been awarded. The Panel notes that this was only an interim award. Levy may be able to produce time records with a final fee application which the bankruptcy court finds adequate to support an award of fees.

*Id.* at 607.

### III.

### APPLICATION TO PRESENT CASE

#### A.

In its earlier opinion on the Houlihan fee application, this court indicted it was "personally familiar with the services provided by the applicant investment banking firm and has no difficulty in concluding such services benefited in some measure these jointly administered estates. Regardless,

applicant's failure to keep time records and consequent inability to produce a fully detailed fee application prevent approval of the full fee requested." *In re Circle K Corp.* 191 B.R. 426, 427 (Bankr.D.Ariz. 1996).

Houlihan appealed to the District Court, which reversed, ruling that section 328 was the proper section for reviewing the application. This court was directed to review the fees pursuant to the "improvidently entered" standard. *See* 11 U.S.C. 328(a). Following that mandated standard, this court awarded Houlihan its full requested fees. Ultimately however, the Ninth Circuit reversed the District Court's decision, determining that section 330 was the correct analytical tool.

In the original slip opinion, the Court's remand instructions were as follows:

> We reverse the district court's decision and remand the case with instructions to grant Houlihan Lokey's fees and expenses in accordance with the bankruptcy court's section 330 assessment.

However, this language was subsequently amended:

> We reverse the district court's decision and remand the case with instructions to remand the case to the bankruptcy court. The bankruptcy court may grant such fees and expenses as it finds appropriate under...section 330, subject to appropriate review by the district court.

*Circle K Corp. v. Houlihan, Lokey, Howard & Zukin Inc. (In re Circle K Corp.),* 279 F.3d 669, 670–71 (9th Cir.2002), *cert. denied,* 536 U.S. 959, 122 S.Ct. 2663, 153 L.Ed.2d 838 (2002)

■ As noted in this court's previous opinion, "applicant's failure to keep time records and consequent inability to produce a fully detailed fee application pre-

vent approval of the full fee requested." 191 B.R. at 427. Indeed, it was only "[a]fter repeatedly advising the Court further documentation of its application was not feasible, [that] applicant now plans to further document its application. Transcript of September 14, at pages 8–12, Docket No. 18064; Houlihan Statement of Position filed October 18, 1995; Docket No. 18062." *Id.* at n. 1. Finally, this court observed:

> Houlihan admits that in its original fee application, filed under section 330, it promised to maintain time records. Actually, applicant agreed to do much more. It agreed to file quarterly reports, log time in half hour increments and provide detailed descriptions of services performed. Finally, applicant agreed to separately, thoroughly list expenses. Letter Agreement at Exhibit D, *supra.* This was not done...
>
> In the present case, the detail provided is woefully short of that required by the U.S. Trustee and section 330(a). Professionals must maintain and present meticulously accurate time records of all services rendered to the estate as a necessary prerequisite to fee recovery. *In re Nucorp Energy, Inc.* 764 F.2d 655, 658 (9th Cir.1985). Detailed fee statements enable the bankruptcy court to fulfill its obligation to examine carefully requested compensation to justify an administrative expense. *Id.*
>
> Here, there is insufficient detail to support such a large fee. There is a duplication between entries apparently prepared by Circle K and the entries prepared by Houlihan....

*Id.* at 432–33.

On January 6, 2003, the court conducted a hearing. Both debtor and Houlihan were permitted to present evidence. Applicant presented the following affidavits: Affidavits of Jared Parker, Duncan Darrow, Gary Burns, Karen Graves, Jeffrey Werbalowsky (with a volume of accompanying exhibits), Richard Chesley and six volumes of accompanying exhibits

A request for Judicial Notice included the following:

1) Docketed orders.

2) Stipulation between the official committees and debtors re: withdrawal of debtor's motion to merge the committees. Administrative file docket number 1076. ("Dkt.").

3) Application for Authority to Retain Salomon Bros. Inc. . . . Dkt. 3175

4) Order Authorizing Retention of Salomon Bros. . . . Dkt. 3817.

5) Order Approving Interim Compensation and Reimbursement Procedure for Chapter 11 Professionals. Dkt. 4469.

6) Amended Order Approving Compensation and Reimbursement for Chapter 11 Professionals and Allowing Compensation and Reimbursement for Committee Professionals Pursuant to Third Interim Applications. Dkt. 5960.

7) Final Application (filed by Salomon Bros). Dkt. 14970.

8) Stipulation for Settlement Between Circle K and Salomon Bros. Dkt. 17067.

9) Order Approving Settlement. Dkt. 17103.

10) Court's opinion and order at *In re Circle K,* 165 B.R. 653 (Bankr.D.Ariz. 1994). Dkt. 16309.

11) Applications to employ various professionals.

12) The court' s June 4, 1993 "Ruling on Matter Taken Under Advisement" (Parts 1 and 2).

In addition, Houlihan filed Designations of the testimony of Bart Brown and Offer of Two Rebuttal Exhibits.

Rebuttal Exhibit 1 is a letter of February 26, 1992 from Andersen Kill Olick and Oshinsky P.C. ("Anderson Kill") Counsel to the Official Bondholders' Committee, indicating the committee's support of debtor's request to extend plan exclusivity by two weeks, if debtors filed a plan predicated on either 1) a reorganization through sale of debtors to the Kathary Group for $425 million (net cash to the estate) or 2) a plan where debtors' long term debt and other securities senior to the committee was not greater than $40 million and the Committee was allocated 20% of reorganization stock.

Rebuttal Exhibit 2 is a letter from debtors' counsel to committee counsel noting that subject to two clarifications, the February 26, 1992 letter accurately reflects the parties' agreements.

Houlihan also offered Revised Exhibits 3, 4 and 5 and Exhibit M to the Judicial Notice Motion and provided additional exhibits N–R as well as attachments 1 and 2, complied from other exhibits.

### B.

Seven years ago this Court found Houlihan made an express agreement with the United States Trustee to keep detailed work records in compliance with previous orders applicable to the other professionals in this case. *In re Circle K Corp.* 191 B.R. at 428, 432. Applicant failed to do so. A "Due Process" argument has been raised to excuse this failure. Closing brief at pgs. 2–10, Dkt. 18901. Houlihan complains (1) it did not receive formal notice of a July 1991 detailed reporting order (although the U.S. Trustee provided applicant with a copy in a November 22, 1991 letter. Dkt. 17761 at exhibit C.), *Id.* at pgs. 2–8 and (2) regardless, the original detailed work reporting order was replaced by a December 18, 1991 order that excludes investment bankers from its cov-

erage. *Id.* at 8–10. Applicant complains it was not served with this order as well. *Id.* at p. 6, n. 10.

Houlihan appears to be urging the following factual contentions: It made a December 1991 commitment with the U.S. Trustee to keep detailed work records and did not do so. Orders were entered before and after this agreement concerning record keeping which originally included (Dkt. 4469) and subsequently excluded investment bankers, such as applicant. Dkt. 5960. It proceeded forward without keeping its time and without checking the court docket to keep apprised of developments in the case, such as orders governing the compensation of professionals.

Presumably the argument is that the December 1991 order, which expressly does not pertain to investment bankers and which Houlihan did not timely receive, not only vacated the earlier order, which Houlihan also didn't receive, but more importantly, silently vacated its agreement with the U.S. Trustee. Thus applicant was free to automatically receive $100,000 monthly with no obligation to keep records establishing what it did to justify this fee or to inquire of the Trustee or Court as to its reporting obligations.

This would be an inadequate excuse for any applicant's inability to provide records to assist the Court in its mandatory § 330(a)(1) fee review. It is especially inadequate coming from an experienced bankruptcy professional "...involved in some of the most significant financial restructurings in recent history..." that has "advised on over 300 transactions, valued well in excess of $100 billion." Affidavit of Jeffrey I Werbalowsky of October 22, 2002 at 4. This Court will reject the procedural due process defense and deal with the substantive objections to the fee application.

### C.

At issue is whether the evidence presented allows the court to sufficiently evaluate whether Houlihan did the work, and whether its work was necessary for the reorganization. In determining whether applicant met its threshold burden, the court will evaluate fee issues using Houlihan's division of time into the First and Second Retention Periods.

#### 1.) The Werbalowsky and Chesley Affidavits and Accompanying Exhibits.

■ Most of the evidence was presented through the Werbalowsky and Chesley affidavits. Mr. Werbalowsky states that from the time of Houlihan's retention, he was Director of the Financial Restructuring Group at Houlihan. He is currently Senior Managing Director and Co–Director of the Firm's Financial Restructuring Group, which has a staff of over 80 professionals. Affidavit at paragraph 7.

Mr. Chesley is a Senior Vice President and Restructuring Counsel for Houlihan, resident in Chicago. He is responsible for legal issues relating to Houlihan's retention as an investment banker and financial advisor in restructuring engagements in and out of bankruptcy. He is also responsible for reviewing retention issues relating to applicant's previous restructuring engagements, including its role as the appointed financial advisor to the Committees in this case. Affidavit at pgs. 1–2.

#### A.) First Retention Period (July of 1990 through December of 1991).

Houlihan concedes it kept no time records, as its practice was to bill on a flat fee arrangement ($100,000 monthly in this case). Nonetheless, Houlihan provided certain detail to outline what it did during this period.

1.) Mr. Werbalowsky notes that during the first retention period, "with our month-

ly invoice, we provided the Debtors with a detailed summary of those projects that we engaged in on behalf of the Creditors' Committee and the Bondholders' Committee ('Summaries'). Copies of these work summaries are attached as exhibits to the ... Chesley Affidavit." Affidavit at p. 6.

There is additional information which provides some detail as to what work was done during this period. Exhibit 9 consists of 35 primary presentations for the Bondholder Committee from July 1990 through April 1993. According to Mr. Werbalowsky, the majority of these presentations are included as exhibits to the Chesley Affidavit. Further, he notes that Exhibit 10 consists of a 25 page detailed description of 24 identified primary tasks performed by Houlihan during this time. Exhibit 11 is an itemization of expense receipts and vouchers for the period as well. *Id.* at 7–8.

2.) Mr. Chesley prepared a detailed summary of Houlihan's efforts on behalf of the Committees on a monthly basis for the first period. Exhibit A. He prepared this exhibit based on his review of working files and business records kept by applicant in its ordinary course, including a review of the monthly invoices submitted to debtors by Houlihan. Additionally he provides a review of time records of other professionals, specifically records of Anderson Kill; Johnston Maynard Grant & Parker; Cleary, Gottlieb, Steen & Hamilton and Price Waterhouse. Copies of these documents, referenced in Exhibit A to his affidavit, were attached.

Is this enough to permit a reasonable evaluation of Houlihan's requested fees for the first Retention Period? Exhibit A does provide a monthly summary of assorted billing events. For example in Month one, there was a teleconference

with counsel regarding the work plan on July 18,1990. Further, Houlihan cites to Exhibit 1 (the Anderson Kill billing statements arising in the first retention period). However applicant did not highlight precisely what task the Anderson Kill billing entry represents in the teleconference. Possibly the billing entry in question is "3 Telephone Conversation Investment Bankers re Meeting with Cleary and Accountants" for a total of apparently 1.0 hours? It cannot be clearly determined.

While Exhibit A provides an overview of monthly events, many cannot be quantified as to time. For example, in month one, Houlihan "Received Committee status report" on August 3, 1990. Houlihan then references Exhibit 8, a copy of the status report prepared by Anderson Kill. Even where it was applicant that generated the work, the problem remains. For example, again in month one, Houlihan "Prepared comprehensive due diligence request to Company 7–31–90", and cites to Exhibit 7. Exhibit 7 is a letter requesting information sent by Houlihan to debtors' executive Bart Brown. Again, it is difficult to measure the time devoted to this effort.

While there is little doubt Houlihan was active, more is needed. Applicant should review all Anderson Kill billing entries referenced at Exhibit A to the Chesley Affidavit and provide a detailed listing of each time entry. This could possibly provide a verifiable measure for particular tasks.

Second, Houlihan should provide more information on the 35 primary presentations for the bondholders' committee. Werbalowsky Exhibit 9. One such primary presentation is titled "Collateral Valuation of Senior Secured Notes," dated February of 1991, clearly within the first retention period. At Exhibit 10, a description of 24 primary tasks performed by Houlihan, applicant provides the following description

of its work on the note holders' collateral valuation:

In conjunction with any plan of reorganization, it was important to determine the value of the collateral securing the Senior Secured Notes (the "Notes"). *At the request of the Company and the Bondholders Committee,* Houlihan Lokey performed an analysis of the Notes and the underlying collateral. Houlihan Lokey had numerous conversations with the Company and outside experts to determine that (sic) the highest and best value of the collateral.

Houlihan Lokey's valuation was presented to the Bondholders Committee in a written report summarizing its findings. Our analysis was detailed and time intensive, reviewing the operations of each of the 425 stores including (sic) in the collateral package. Sensitivity analysis was performed on the operating results of each of the stores, financial models were created to ascertain the value of each store, a review of the environmental status of each of the stores was undertaken, and an analysis of the impact of Circle K's intangible assets was performed to determine the relative value of the collateral stores. Portions of Houlihan Lokey collateral valuation were ultimately shared with all other creditor groups at an "all hands" meeting in January, 1992. The purpose of the meeting was to share the collateral valuations and attempt to reach a conclusion as to the value of the collateral. No consensus was reached at the meeting, after each group...presented their analysis. As a result of the presentation by the other advisors, the Bondholders Committee instructed Houlihan Lokey to review each group's valuation conclusions and methodologies.

Houlihan Lokey's valuation analysis was updated several times thereafter to reflect additional information received,

including more recent financial results. Ultimately, the Houlihan Lokey valuation analysis of the Noteholders collateral was used by the Bondholders Committee in the confirmation hearings.

Exhibit 10 at pgs. 7–8.

Finally at Exhibit 54 to the Chesley Affidavit is an apparent copy of the report to the Committee from Houlihan regarding a collateral valuation of senior secured notes. To provide a better measure for evaluation, more is needed than what was provided regarding this collateralization work. Some quantitative measure is needed before the court can evaluate this work product along with the other services provided to the Committee and any other constituencies in this case. It may well be that Houlihan could provide more reconstruction of its records and testimony as to how the work flows in preparing reports, attending meetings, and the like. An entity that can produce a work product on complex business structures such as Circle K, should be able to provide a better analytical tool for evaluation of its own product. As it now stands, fees sought during the first Retention Period are disallowed unless a) applicant can provide a detailed discussion of the Anderson Kill time entries related to work performed by Houlihan and b) additional reconstruction of applicant's records as to the balance.

*B.)Second Retention Period (January 1992 through April 30, 1993)*

■ In addition to the 35 primary presentations discussed at Exhibit 9 and the 25 page descriptions of 24 identified tasks performed by Houlihan in exhibit 10, applicant has produced "Daily time entries for Houlihan Lokey professionals for the Second Retention Period." Werbalowsky Af-

fidavit at p. 7. The daily time entries are at exhibit 8 to the Affidavit.

According to Mr. Werbalowsky, he was "the primary person who supervised the compilation and otherwise assembled the Records relating to the Second Retention Period." In that regard Houlihan Lokey personnel, under [his] direction did the following:

(a) Collected calendars of the Houlihan Lokey personnel maintained in the ordinary course of their business activity that were involved in the Circle K representation for the Second Retention, and went through those in detail.

(b) Reviewed, in depth, the internal files at Houlihan Lokey maintained in the ordinary course of Houlihan Lokey's business, including presentations made to the various parties in the case (including the Bondholders Committee and others).

(c) Went through the fee applications filed by counsel for the Bondholders Committee (Anderson Kill) to refresh [his] recollection of the meetings and other matters in which Houlihan Lokey was involved during the course of the Circle K bankruptcy proceeding.

Werbalowsky Affidavit at page 8.

The apparent result of these efforts is a 68 page billing statement. This document generally provides information on the date, the billing agent (the Court presumes this is what is meant by "Ind" or "Staff") by initials, the hours recorded (in hour and .5 segments) and a description of services. For example:

| Date | Ind. | Hours | Description |
|------|------|-------|-------------|
| 920102 | BBP | 5.0 | General Industry Review and Comparable Company Analysis |
| or | | | |
| 920107 | LJM | 3.0 | Customer Base and Demographic Analysis |
| or | | | |

| Date | Ind. | Hours | Description |
|------|------|-------|-------------|
| 920223 | ABM | 2.5 | Meeting Re: Status of Case [2] |

or

| Date | Description of Services | Staff | Hours |
|------|------------------------|-------|-------|
| 02–19 | Conference call w/potential purchaser | MAK | 1.0 |

or

| Date | Description of Services | Staff | Hours |
|------|------------------------|-------|-------|
| 02–22 | Review of and analysis of actual operating results Relative to Business Plan | RAY | 6.0 |

Other time entries are organized by professional. For example:

Houlihan Lokey Personnel: Alan Fragen, Associate

| Date | Activity | Hours Spent |
|------|----------|-------------|
| 4/6/93 | Preparation for Confirmation Hearings; | 7.0 |

The 68 pages, while not contemporaneously produced, do provide detail as to Houlihan involvement in the case during the second Retention Period. Applicant's billing information would have been clearer if it had provided the total number of hours and information on each professional's billing rate. However, the number of hours submitted for the second Retention Period appears to total approximately 6,238.[3] While listed hours alone do not establish that fees are reasonable or services were actually rendered, it is evidence Houlihan was heavily involved in this case. Further, the current application for the second retention period now meets most minimum requirements outlined in the United States Trustee's letter dated of November 22, 1991:

> We propose that each billing professional report their time in half-hour increments and provide a detailed description of services performed. Expenses must be separately and thoroughly listed. Copies of receipts for all travel expenses must be provided....

> A quarterly report containing professional's time entries and summarizing how the services benefited the estates must be filed with the Court with copies served upon (the listed) interested parties....

Letter at Exhibit 6 (Werbalowsky Affidavit).

In response, applicant stated:

> As we discussed, Houlihan Lokey...will continue to receive a fee of $100,000 per month, payable in advance, plus reasonable out-of-pocket expenses. Houlihan Lokey will file with the Bankruptcy Court quarterly reports containing its professionals' time entries and summarizing how the services provided benefited the estate. Houlihan Lokey professionals will report their time in half-hour increments and provide detailed descriptions of the services performed. Expenses will be separately and thoroughly listed with copies of all receipts for travel expenses provided. Houlihan Lokey has agreed to implement this reporting procedure as of November 1, 1991.

Letter at Exhibit 7, (Werbalowsky Affidavit).

In determining whether the fees sought for the second retention period are reasonable:

> The primary method used to determine a reasonable...fee in a bankruptcy case is to multiply the number of hours expended by an hourly rate. (citation omitted). Under the present Bankruptcy Code, the hourly rate must be based on the rate that would be charged for comparable services in a non-bankruptcy case. Factors appropriate to the determination of a comparable rate in this case would include (1) the rate normally charged by (applicant) in comparable non-bankruptcy cases where an hourly

---

2. On that particular day four employees billed the same 2.5 hours to attend the meeting re: status of the case. They appear to be the primary billing agents: ABM, MAK, RAY, and ING. There are also travel time entries.

3. Applicant asserts a total of 6,173.5 hours in its post trial level. Dkt. 18901 at P. 21.

fee is used; (2) the prevailing rate for such work in the area during the period in question; and (3)the number of hours of work claimed, if any, that were actually performed by persons whose services are generally billed at a lower rate.

*Yermakov v. Fitzsimmons (In re Yermakov),* 718 F.2d 1465, 1471 (9th Cir.1983).

■ However this is only the primary method of determining fees. The court has authority to determine alternative methods. *Unsecured Creditors' Committee v. Puget Sound Plywood, Inc.,* 924 F.2d 955, 960 (9th Cir.1991).

In the present case, the flat fee arrangement was expressly approved by this court. Dkt. 1544. The United States Trustee had no objection to a flat fee, but required Houlihan to provide supporting billing information, which applicant did not do. Notwithstanding the failure to provide an identified rate structure, multiplied by specific hours actually worked, under the totality of circumstances, the information provided for the second Retention period, specifically including Exhibit 8 to the Werbalowsky Affidavit, indicates the fees are reasonable. They also appear to comport with fees charged by other investment bankers in this case. See Revised Exhibits 3, 4, and 5 to Houlihan Reply Brief submitted for January 6, 2003 hearing.

■ As to whether the fees are for necessary services, *Puget Sound Plywood, supra* disagreed with the argument that the work's results are irrelevant. *Id.* at 958. The court held that the "bankruptcy court's intervention order...did not give Uziel free reign to run up a tab without considering the maximum probable recovery. On the contrary, prior to working on the Chase objection, Uziel was obligated to consider:

(a) Is the burden of the probable cost of legal services disproportionately large in relation to the size of the estate and maximum probable recovery?

(b) To what extent will the estate suffer if the services are not rendered?

(c) To what extent may the estate benefit if the services are rendered and what is the likelihood of the disputed issues being resolved successfully?"

924 F.2d at 958–59.

In *Puget Sound,* a committee intervened to recover $120,000 in attorney fees paid to creditor Chase. Chase was an oversecured creditor. Its contract with the debtor provided for attorneys' fees. Counsel for the committee implied that because the potential recovery was $120,000, all fees were justified. The bankruptcy court disagreed. It abandoned the lodestar review approach, instead using a one-third recovery theory. The Ninth Circuit affirmed, noting that a reasonable attorney would have known there was no chance of recovering the full $120,000 of fees, as Chase was oversecured and the contract expressly provided for reasonable attorneys fees. Using the reasonableness requirement of § 506(b), the bankruptcy court pared Chase's fees by $18,517.90.

In short, counsel in *Puget Sound* failed to perform the requisite cost benefit analysis before beginning work. The court therefore reduced fee recovery through a cost-benefit analysis *See also Estes & Hoyt v. Crake (In re Riverside–Linden Inv. Co.),* 925 F.2d 320, 322 (9th Cir.1991), finding no abuse of discretion in declining to award fees. There the estate was solvent. None of debtor's partners had objected to a certain claim. The bankruptcy court saw no purpose for a lengthy investigation of the claim, noting " 'when a cost benefit analysis indicates that the only parties who will likely benefit from an investigation of a claim are the trustee and his professionals, investigation is unwarranted.' " *Id.*

A recent case, dealing with amended § 330, found a split of authority as to the legal standard used to determine whether services are necessary or beneficial to the debtor's estate. *Roberts, Sheridan & Kotel P.C. v. Bergen Brunswig Drug Co. (In re Mednet)*, 251 B.R. 103, 107 (9th Cir. BAP 2000). The Court rejected a standard that fees are only compensable if they result in a material benefit to the estate. *Id.* at 108. Instead, "the applicant must demonstrate only that the services were 'reasonably likely' to benefit the estate at the time the services were rendered." *Id.*

In opposition to the present application, Debtor filed the Affidavit of Bart Brown, Jr. Mr. Brown was chairman of the board of Circle K during the time of debtors' reorganization proceedings, from June of 1990 through August of 1995. He was both chairman and CEO from July 1991 through July of 1993. He states:

In my role and capacity of Chairman and CEO of Circle K, I respectfully submit that Houlihan Lokey in no way provided value to the bankruptcy process in any amount near the amount requested. Generally speaking, Houlihan Lokey and the Bondholder Committee had the least amount at stake in the case and provided little or no constructive analysis or advice to the process. From day one, the Bondholder Committee was out of the money.

It became very evident to me within the first very few months of the reorganization process that the entire constituency of the Bondholder Committee would receive nothing, through either the reorganization sale or liquidation of the business. The only way for Bondholders to get anything was to negotiate a minimal recovery with the other creditor constituencies, all of which knew the Bondholder Committee was out of the

money and would have only considered a penny or so on the dollar for the Bondholders. Arguably, if Houlihan Lokey can provide to the Court that it provided services during this time period, it would be fair and appropriate to pay Houlihan Lokey something.

However, Houlihan Lokey continued to take money from Circle K on a monthly basis even when it was objectively certain that its services in any capacity were no longer necessary. In fact, Houlihan Lokey was an impediment to the consensual reorganization process, and Circle K was forced to engage in an approximately two (2) week trial to confirm the eventual plan of reorganization over the vigorous objection of the Bondholder Committee.

The Bondholders received nothing under the confirmed plan....During the case, the Bondholders would have received nothing if Houlihan Lokey had been paid $100,000 or $3.3 million. It is objectively inappropriate for Houlihan Lokey to seek compensation for services that, even if proved to this Court's satisfaction actually occurred, should never have (sic) ever been provided by Houlihan Lokey in this case.

Brown Affidavit at paragraphs 7–10. (Dkt. 18877).

Objector employs a hindsight test, viewing only the eventual results of the confirmation process. In doing so, Circle K ignores that the bondholders filed and advocated a competing plan. Bondholder counsel was paid substantially all of its fees and expenses for its work on behalf of the committee. The argument that the bondholders had the least at stake, because they were allegedly always "out of the money" glosses over the fact that the United States Trustee appointed an official bondholders committee to function in this case. *See* Dkts. 300 and 301.

Subsequently, debtors filed a motion to consolidate the two official committees. The motion was opposed. A settlement was reached. By stipulation the parties agreed to procedures governing the retention of financial advisors by the Committees. Dkt. 1076 at page 8. Debtors acknowledged that each committee, subject to court approval, was entitled to retain a financial advisor. In turn, the committees acknowledged debtors had the right to "object to the terms of such retention, including compensation." *Id.*

The committees acknowledged that there could be times when the services of financial advisors were "not as essential as they may be during other periods of time. In recognition of such fact, each Committee will use its best efforts to seek some discrimination in the monthly advisory fees that are to be paid its respective Financial Advisor, consistent with the objective of avoiding unnecessary professional advisory work and the accordant costs to the Debtors' Estates." *Id.* at 9 and 10.

In short, the bondholders' committee was expressly authorized to employ a financial advisor. The committee was actively involved in the case, preparing and litigating a competing plan, which proposed that the bondholders were not "out of the money."

Houlihan has provided affidavit testimony that its services were necessary. Attorney Jared Parker served as co-counsel to the official unsecured creditors' committee from June 18, 1990 through September 30, 1993. Parker notes he was one of the primary attorneys at his firm involved in the case.

Affiant states the bondholder committee represented holders of about $425 million in subordinated public debt. The reorganization effort was complex, lasting nearly three years. Parker reports debtor proposed a plan to sell the company that was ultimately supported by his committee. However, the bondholder committee argued that a reorganization of debtor on a stand alone basis was in the best interests of creditors. Accordingly it put forth an alternative plan. Ultimately, the court confirmed debtor's plan over the bondholders' objections and competing plan.

Mr. Parker states that he had regular interaction with applicant's staff through meetings, phone calls, and in reviewing analyses and reports. He notes that in large bankruptcy cases, it is common for official committees to openly communicate through counsel and advisors. While noting the divergent views that subsequently developed between the committees, he states Houlihan and its professionals represented their client constituency zealously and actively participated in meetings with both Debtor and the creditors committee. In his opinion, the Houlihan work product was thorough and met the needs of Houlihan's constituency. Affidavit at pgs. 2–3.

Duncan Darrow was a partner at Anderson Kill. His firm represented the bondholders committee. Mr. Darrow was actively involved in the case and participated in the appointment process, where the committee interviewed and selected an investment banker/financial advisor. Houlihan was ultimately chosen. From July of 1990 until late February 1991, Houlihan by agreement, provided financial advisory services to both committees.

Mr. Darrow states he worked regularly, extensively and intensively with the Houlihan professionals. From his 20 years experience as a bankruptcy lawyer, he generalizes that it is common for financial advisors and counsel for a committee to work very closely, since legal, financial and strategic issues overlap and are interrelated. Mr. Darrow states that the Houlihan professionals were actively in-

volved in representation of the committee. He feels the committee could not have properly fulfilled its functions without the efforts of, among others, Houlihan. Finally, he states that the bondholders committee was aware of what applicant was doing "since many of Houlihan Lokey's actions were at the express request or direction of the Bondholders Committee or its counsel. In addition, Anderson Kill was receiving monthly synopses by Houlihan Lokey (which were also being provided to counsel for the debtors in these cases)". Affidavit at 3–4.

Similar testimony was presented in Gary Burn's affidavit. Mr. Burns was Senior Manager of Price Waterhouse, retained to act as accountants and do financial advisory work for the Creditor's Committee. He also states that Houlihan professionals zealously represented their constituency and were actively involved in all material phases of the case. He is aware of nothing indicating that Houlihan work product was anything but professional and thorough. Affidavit at 2–3.

This was a complex case. Two committees were appointed. For a time, Houlihan worked for both. While the bondholders were "out of the money" under debtor's plan, their committee presented a plan that protected their interests. The bondholders zealously opposed debtor's plan and promoted their own. This court ultimately confirmed debtor's plan rather than the bondholder's proposal.

Here, the applicant should not be denied fees on the basis that it made no difference whether it did its work. This is hindsight reasoning, applied to only one of the professionals, rather than an across the board effort by Debtor to deny fees to all bondholder professionals.

This is unlike the situation confronted in *Puget Sound.* There, it was obvious the creditor was entitled to reasonable fees, since it was over secured by its collateral and thus had the protections of § 506(b). A reasonable attorney would realize litigation would have virtually no chance of fully recovering the entire $120,000 fee. At the time the litigation was undertaken, a reasonable cost-benefit analysis would have revealed that counsel's services would not be reasonably likely to benefit the estate in that case. 924 F.2d at 959.

Here there is little presented to suggest Houlihan's services, at the time rendered, would not be reasonably likely to benefit the committee. Debtor's position, presented largely through the Brown Affidavit, ignores the scope and size of the bondholder constituency and its need for representation and expert analysis in a case where the constituency faced a $425 million loss. Further, Circle K ignores the following:

a) As late as February 26, 1992 debtor was considering a plan in which the bondholder committee would be allocated 20% of the reorganization common stock. *See* Rebuttal Exhibits 1 and 2. The committee agreed it would support such a plan. While Mr. Brown testified that a 20% equity value was not of real value, it was nonetheless a recovery. Brown deposition at pages 33–34. It is disingenuous to assert, through Brown's affidavit, that just a few months into the reorganizations, it was clear the bondholders would receive nothing, when Circle K was still considering support of a plan which would yield a dividend to these creditors.

b) The stipulation regarding withdrawal of Debtor's motion to consolidate the committees provided in part:

> While the Debtors and each of the two Committees shall use its best efforts to observe and comply with the terms of this Stipulation, they all also recognize that developments in this case may warrant that certain of the terms of this Stipulation be revised or modified, and

the Debtors and each of the two Committees reserves its right to seek such changes as circumstances dictate.

Stipulation at page 10 (Dkt. 1076).

According to the Affidavit, it was clear to Mr. Brown that the bondholders were out of the money early in the case. Yet he concedes he never asked Debtors' counsel to seek an order disbanding the Committee, or asked the court to reduce the monthly fees paid to any financial advisor. Brown Deposition at pages 38–40.

c) Mr. Brown agreed that at least through December 12 1991 debtor consulted with Houlihan as a financial advisor, soliciting its input. Brown Deposition at page 29.

Simply arguing that Houlihan provided no value and made no difference to this case, is a hindsight view that ignores the above. Such a position is inconsistent with the fact that the bondholders' counsel was paid virtually all its fees.

## IV.

### CONCLUSION AS TO FEES

1) As to the First Retention Period, fees are disallowed unless a) applicant can provide a detailed listing of Anderson Kill time entries which relate to and explain work performed by Houlihan and b) applicant can provide additional reconstruction of its records as to the balance of its time.

2) As to the Second Retention Period, fees are allowed. Houlihan has provided a sufficient record to demonstrate the fees are reasonable compensation for necessary services that were actually rendered.

## V.

### CONCLUSION AS TO REIMBURSEMENT OF EXPENSES

The United States Trustee's letter to Houlihan proposed that expenses be separately and thoroughly listed in any reimbursement application. Copies of receipts for all travel expenses were required. Exhibit 11 to the Werbalowsky Affidavit provides such a listing. Expense Receipts appear to be organized by professional and year. There is a summary by date and category of each year's out-of-pocket expenses by professional. There appear to be backup receipts.

While there is sufficient information to allow an award of Houlihan's out of pocket expenses for the second retention period, an award cannot be made for expenses for the first period, as the court lacks sufficient information. Accordingly the court will only allow reimbursement of expenses incurred for the second retention period.

## VI.

### ORDER

*It is ordered* denying the application in part and granting the application in part. The parties will appear for a status hearing in Courtroom number four, Tenth floor, 2929 N. Central Avenue in Phoenix on the 14th day of July, 2003 at 9:00 O'clock a. m.